WYATT INCORPORATED

v.

CITIZENS BANK OF PENNSYLVA-
NIA and Mellon Bank, N.A.

Appeal of Citizens Bank
of Pennsylvania.

Wyatt Incorporated, Appellant

v.

Citizens Bank of Pennsylvania and
Mellon Bank, N.A., Appellees.

Wyatt Incorporated

v.

Citizens Bank of Pennsylvania
and Mellon Bank, N.A.

Appeal of Apostolos Group, Inc.

Wyatt Incorporated

v.

Citizens Bank of Pennsylvania
and Mellon Bank, N.A.

Appeal of Mendel Steel Ornament
Iron Company.

Wyatt Incorporated

v.

Citizens Bank of Pennsylvania
and Mellon Bank, N.A.

Appeal of Lighthouse Electric
Company.

Wyatt Incorporated

v.

Citizens Bank of Pennsylvania
and Mellon Bank, N.A.

Appeal of James E. Huckestein, Inc.

Superior Court of Pennsylvania.

Argued Nov. 19, 2008.
Filed June 4, 2009.

Gary F. Sharlock and Jeffrey P. Brahan, Pittsburgh, for Wyatt.

Harvey E. Robins, Pittsburgh, for Huckestein.

Ericson P. Kimbel, Pittsburgh, for Lighthouse.

Nicholas G. Deenis, Jr., Philadelphia, for Citizens Bank.

BEFORE: BOWES, FREEDBERG, and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 These six appeals stem from the September 28, 2007 judgment in a Mechanics' Lien action entered in favor of the

plaintiffs Wyatt, Inc., Apostolos Group, Inc., Mendel Steel and Ornamental Iron Co., Lighthouse Electric Co., and James E. Huckestein, Inc., (collectively Subcontractors) and against Citizens' Bank. Each party filed an appeal, and because the issues on appeal arise from the same factual scenario and involve similar arguments, we will address them contemporaneously. Upon review, we vacate the judgment and remand for computations consistent with this Opinion.

*Citizens' contract with Carlson*

¶ 2 The causes of action arose from work performed at Three Mellon Bank Center in Pittsburgh, Pennsylvania, a 41–story office building built in the late 1940s. Mellon Bank was the owner of the premises and, in 2001, entered into a ten-year lease with Citizens for approximately 206,000 square feet of space in Three Mellon Center.[1]

¶ 3 Prior to this time, Citizens did not have a banking presence in Western Pennsylvania. In an effort to expand into this region, Citizens leased the space of Three Mellon Center in order to perform banking functions and to construct a regional headquarters, which included executive offices.

¶ 4 In an effort to utilize the leased space in a specific manner, Citizens retained Carlson Implementation Associates, Inc., as the construction company responsible for the design and renovation of the leased space (Project). The leased space was not suitable to Citizens' needs in its pre-Project condition. Prior to the Project, Mellon used the leased space for its walk-up banking business. Carlson was the only construction company interviewed by Citizens, and the job was not put out for competitive bids.

¶ 5 Carlson initially submitted a Guaranteed Maximum Price (GMP) proposal to Citizens which set the maximum price of construction at approximately $12 million. Under the terms of the proposal, Carlson was to be "at risk" or would incur all costs of performing the Project even if the total costs exceeded the adjusted contract sum.

¶ 6 On or about October 15, 2001, Citizens entered into an American Institute of Architecture (AIA) Contract with Carlson regarding the Project. Although the form contract was submitted by Carlson, it was never signed nor was any other written agreement between Carlson and Citizens ever executed. Nonetheless, Citizens and Carlson understood that its terms governed their relationship as to the Project. Carlson submitted a number of change orders to Citizens that increased the GMP by approximately $2 million.[2]

¶ 7 Three Mellon Center is a steel structure with an outer skin and core areas,[3] which are structural areas in the building which cannot be taken down without causing the collapse of the entire building. The space on each floor was demolished with the exception of the core. Carlson did not perform the work on the Project, but, instead, hired various firms, including the Subcontractors, to perform the required work. The Subcontractors entered into separate subcontracts with Carlson to perform their work on the Project. The

---

1. The parties stipulated that Citizens leased all of floors 20 through 29 and portions of the 17th floor and basement. N.T. non-jury trial, 1/12/2006, at 75. However, the stipulation may have been inaccurate because the project did not call for work on the 20th floor and the trial court indicated that Citizens leased nine full floors.

2. Mellon paid to Citizens approximately $6.8 million as payment for capital improvements to Three Mellon Center.

3. The core areas included the elevators and elevator shafts, the electrical closets, the air handling units, and the stairwells.

scope of each Subcontractors work as defined in their individual subcontracts was undisputed and is detailed below.

*Wyatt Incorporated*

¶ 8 On or about December 31, 2001, Carlson entered into a subcontract with Wyatt to perform work on the Project. The original amount of the subcontract was $1,515,947.00. After Carlson approved change orders, the subcontract amount increased to $3,289,254.00. According to the terms of the subcontract, Wyatt was to complete the drywall and ceiling of the project. Prior to this work, Wyatt had done demolition work on the Project; however, this work was not the basis of the Mechanics' lien action.

¶ 9 The work pursuant to the subcontract included installation of metal stud drywall, acoustic ceiling tile, doors, doorframes, restrooms, hardware, and concrete work on floors 21 through 29, one half of floor 17, and the mailroom in the basement. Wyatt installed fire-resistant drywall and ceiling tiles in the UPS (uninterrupted power supply room), computer server, IDF, and MDF (main distribution frame) rooms. It also renovated the core area elevator lobbies to include domed ceilings.

¶ 10 On the 24th floor, Wyatt also demolished and refinished the exterior portion of some columns in order to provide space for a high density filing system to be installed by another subcontractor. On the 27th floor, Wyatt constructed a fitness room with a restroom. Between the 28th and 29th floor, Wyatt installed decking to accommodate the monumental staircase that was to connect the two floors. Wyatt also raised the floor in the computer room.

¶ 11 Wyatt completed its work on January 21, 2003. Of the amended subcontract amount, Wyatt claimed that it was not paid for $83,779.83 for its work on the project. On February 27, 2003, Wyatt informed Citizens that it was owed $83,779.83 for its work on the Project. On April 15, 2003, Wyatt provided formal notice of its Mechanics' Lien to Citizens and to Carlson.

*Apostolos Group, Inc.*

¶ 12 On February 4, 2002, Carlson subcontracted with Apostolos for painting related to the Project. The initial subcontract was in the amount of $192,154.00 and increased to $414,705.00 after change orders were made.

¶ 13 Apostolos applied paint and wall covering to the walls on floors 21 through 29. It also painted the unfinished doors and door frames on these floors. Apostolos was to touch up any scratches on existing exterior windows. Apostolos applied an epoxy paint for the UPS floor and angle frame paint under the battery cabinet in that room. On February 12, 2003, Apostolos completed its painting work. On April 9, 2003, Apostolos provided Citizens notice of its Mechanics' Lien.

*Mendel Steel and Ornamental Iron*

¶ 14 Carlson subcontracted with Mendel Steel on January 31, 2002, to perform miscellaneous steel and structural steel work on the Project. Mendel Steel's work included fortifying the structural steel to support the new opening between the 28th and 29th floors. It also installed the structure for the monumental staircase between the 28th and 29th floors. This staircase was to be a showpiece, or focal point, of those floors and was the sole means of access between the floors. Regarding the stairs and adjoining balcony on the 29th floor, Mendel Steel was to provide the steel supports, brackets, glass, and stainless steel railing. Mendel Steel reinforced the raised floor built by Wyatt that was to support the high density rolling filing system on the 24th floor. It was also to supply the plate steel to be used at the UPS battery cabinet. Mendel Steel also

supplied steel clips for lobbies and installed steel supports for toilet partitions and vanity counters in the restrooms. Mendel Steel completed its work on the Project on April 3, 2003.

¶ 15 On March 14, 2003, Mendel Steel sent a letter to Carlson indicating the balance owed for work on the Project and demanding payment in the amount of $74,097.10. This letter was not sent to Citizens. On April 3, 2003, Mendel Steel provided Mellon with formal notice of its intention to file a Mechanics' Lien action; Mendel Steel provided Citizens and Carlson with a copy of this letter.

*Lighthouse Electric Company*

¶ 16 On January 7, 2002, Lighthouse entered into a subcontract with Carlson for electrical work on the Project. After various change orders, the amount of the subcontract increased to $2,854,821.82. Lighthouse began work on the Project in December of 2001, prior to entering into the subcontract. Pursuant to the subcontract, Lighthouse was to upgrade the electrical distribution to the leased floors. This included the installation of conduit to run the power distribution system. It was to provide power to the other workers until it had upgraded that space. Lighthouse also installed an emergency power distribution system in conduit from the basement to the floors 21, 22, 23, and 29 in order to power the computer systems in the event of an outage. Lighthouse installed electrical lines for the HVAC system, wiring for the computer networks, and lighting fixtures. In the newly-built computer room, Lighthouse installed an UPS system. Lighthouse reused a majority of the existing lighting and fire safety systems, but it needed to provide power to the safety fixtures. It provided new lighting for the executive offices, toilet rooms, and elevator lobbies. It also connected the furniture power feeds following the installation of the furniture.

¶ 17 In addition to the electrical work, Lighthouse also installed security devices throughout the leased premises. Card readers and security cameras were installed on floors 21 through 29. It provided raceways with pull lines for the telecommunications outlets and security devices in locations that otherwise would be inaccessible. It was also to clean and re-lamp the light fixtures prior to the final cleaning of the floor.

¶ 18 Lighthouse's work on the Project was completed on February 10, 2003.[4] On March 24, 2003, Lighthouse provided notice to Citizens and Mellon of its intent to seek a Mechanics' Lien.

*James E. Huckestein, Inc.*

¶ 19 Carlson entered into a subcontract with Huckestein on January 7, 2002, to perform heating, ventilation, and air conditioning system (HVAC) work on the Project. The initial subcontract was in the amount of $425,957.00 and increased to $688,093.74 following the change orders. Huckestein was to install HVAC throughout floors 21 through 29. Huckestein installed duct work from the core areas on the floors to the remaining leased space on each floor in a manner that suited Citizens. The air handling units were located in the core areas and were not replaced by Huckestein. However, the previous duct work was removed during the demolition

---

**4.** Lighthouse alleged at trial that it did not complete its work because it had not installed a transient voltage surge protector, which did not arrive until late. However, in its Mechanics' Lien Claim filed at GD–03–009611 on May 21, 2003, Lighthouse stated that the completion of its work was on February 10, 2003. It was improper to attempt to claim differently at trial; however, the trial court considered, as Lighthouse asserted in its Mechanics' Lien complaint, that it had completed its work.

phase of the Project. Huckestein installed temperature systems in the computer server, IDF, and MDF rooms. It also installed a piping system to tap into Three Mellon Center's chilled water system. Huckestein cleaned and adjusted the existing Moduline units. Huckestein completed its work in January of 2003.

¶ 20 On February 26, 2003, Huckestein sent a letter to Citizens and Carlson requesting payment of $103,993.75 for work on the Project. The letter also advised of Huckestein's intent to file a Mechanics' Lien.

*Filing of Mechanics' Liens*

¶ 21 On January 2, 2003, Citizens released final payment for the Project to Carlson,[5] although not all of the work of the Subcontractors had been completed at that time. Carlson left the job just prior to Christmas of 2002, by that point, the Project was almost completed. Citizens and Carlson did not perform the final cost analysis which had been contemplated under the proposed GMP contract. Citizens never requested Carlson to post a bond to protect against potential liens and did not exercise any of the rights available under the unsigned GMP contract to protect against claims of unpaid contractors or suppliers.

¶ 22 Carlson filed for bankruptcy on March 12, 2003, in the United States Bankruptcy Court for the District of Massachusetts at Case No. 03–12033. Some of the Subcontractors received distributions from the Carlson bankruptcy, but none were paid in full.

¶ 23 Each Subcontractor then filed a Writ of Mechanics' Lien against Citizens and Mellon for their work done on the Project. The five separate actions were consolidated by Order of Court entered August 22, 2003. Afterward, Subcontractors filed separate Mechanics' Lien complaints, which also asked for penalties, interest, and attorneys' fees pursuant to Pennsylvania's Contractors and Subcontractors Payment Act (CSPA), 73 P.S. §§ 501–516; these actions were consolidated for trial by Order dated January 11, 2006.

¶ 24 Following a non-jury trial, the trial court found that the Subcontractors had valid Mechanics' Lien claims against Citizens and entered a verdict as follows:

| | |
|---|---|
| Lighthouse Electric Co. | $111,680.01 |
| Wyatt Inc. | 83,779.83 |
| Apostolos Group, Inc. | 41,470.50 |
| Mendel Steel and Ornamental Iron Co. | 66,846.98 |
| James E. Huckestein, Inc. | 97,651.43 |

Non-jury verdict, GD–03–009486, 10/4/2006. The trial court issued an opinion stating its basis for its verdict.

¶ 25 Each party timely filed motions for post-trial relief. The trial court conducted oral argument and reviewed the parties' briefs. On September 18, 2007, the trial court entered its order denying Citizens' motion for post-trial relief and granting the Subcontractors' motion for post-trial relief to the extent that they requested an award of interest on their claims. The trial court amended the verdict to include interest on these amounts from the date that the Mechanics' Liens were filed. The trial court denied the Subcontractors remaining requests for relief. Trial court order, 9/18/2007. On September 28, 2007, the verdict was reduced to judgment. Each party timely filed a notice of appeal. The trial court ordered each appealing party to file a Pa.R.A.P. 1925(b) statement; they complied. The trial court authored a Pa.R.A.P. 1925(a) opinion.

---

**5.** Citizens paid only Carlson for the work on the Project. Carlson paid each Subcontractor for its work on the Project.

¶ 26 Appellate review in these cases implicates the following general principles:

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, [where] the issue . . . concerns a question of law, our scope of review is plenary.

The trial court's conclusions of law on appeal originating from a non-jury trial "are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts" of the case.

*Wilson v. Transp. Ins. Co.,* 889 A.2d 563, 568 (Pa.Super.2005) (citations omitted).

¶ 27 On appeal, Citizens challenges the validity of the Mechanics' Liens and the Subcontractors challenge the amount of the award. We will address Citizens claims first.

*1829 WDA 2007*

¶ 28 Citizens presents the following questions for our review:

1. Did the trial court err in finding [Subcontractors] were not required to serve preliminary notice of their intent to seek Mechanics' Lien claims before completing their work at the Premises, in the manner required by 49 P.S. § 1501(a)?

2. Did the trial court err in finding that the work performed by [Subcontractors] at the Premises was "erection and construction" and not "alteration and repair" as defined by the Lien Law?

3. Did the trial court err in finding that the work performed by [Subcontractors] at the Premises constituted an "adaptation of an existing improvement rendering the same fit for a new and distinct use?"

4. Did the trial court err in not specifying the amount or rate of interest that it awarded to [Subcontractors] with any particularity in its September 17, 2007 Order, which should be limited to post-judgment interest at the legal rate of 6% per annum? *See* 42 Pa.C.S.A. § 8101; 41 P.S. § 202.

5. Did the trial court err in awarding [Subcontractors] interest between the date they filed their Mechanics' Lien claims and the date of the judgments?

Appellant's brief in 1829 WDA 2007, at 4.

¶ 29 The Mechanics' Lien Law, Title 49 of Pennsylvania's Statutes, is a creation in derogation of the common law, and, therefore, any question of interpretation shall be resolved in favor of strict, narrow construction. *Wentzel–Applewood Joint Venture v. 801 Market Street Associates, L.P.,* 878 A.2d 889, 892 (Pa.Super.2005) (citation omitted). To effectuate a valid Mechanics' Lien claim, the contractor or subcontractor must strictly comply with the requirements of Title 49. To file properly a Mechanics' Lien, a subcontractor must strictly comply with the notice requirement of § 1501, which states in pertinent part:

(a) Preliminary notice in case of alteration and repair. No claim by a subcontractor for alterations or repairs shall be valid unless, in addition to the formal notice required by subsection (b) of this section, he shall have given to the own-

er, on or before the date of completion of his work, a written preliminary notice of his intention to file a claim if the amount due or to become due is not paid. . . .

(b) Formal notice in all cases by subcontractor. No claim by a subcontractor, whether for erection or construction or for alterations or repairs, shall be valid unless, at least thirty (30) days before the same is filed, he shall have given to the owner a formal written notice of his intention to file a claim, except that such notice shall not be required where the claim is filed pursuant to a rule to do so as provided by [49 P.S. § 1506].

49 P.S. § 1501(a), (b).[6]

¶ 30 Under the Mechanics' Lien Law, a subcontractor is required to provide notice prior to filing a claim for unpaid labor or materials. 49 P.S. § 1501. The type of notice required depends upon the character of the work performed as defined in the Mechanics' Lien Law. If the work meets the definition of "erection and construction," no preliminary notice is required from a subcontractor, but a formal written notice of its intention to file a Mechanics' Lien claim must be made at least 30 days prior to filing such a claim. 49 P.S. Section 1501(b). If the work meets the definition of "alteration and repair," then preliminary notice must be given by each subcontractor prior to completing its work on the Project. 49 P.S. § 1501(a).

■ ¶ 31 In this case, as there is no dispute that the Subcontractors failed to give preliminary notice of its intention to file a Mechanics' Lien prior to their completion of work on the Project, the query of whether such notice was required rests on whether the work performed qualifies as "erection and construction" or "alterations and repairs." The Mechanics' Lien Law defines the relevant phrases as follows:

> **"Improvement"** includes any building, structure or other improvement of whatsoever kind or character erected or constructed on land, together with the fixtures and other personal property used in fitting up and equipping the same for the purpose for which it is intended.
>
> **"Erection and construction"** means the erection and construction of a new improvement or of a substantial addition to an existing improvement or any adaptation of an existing improvement rendering the same fit for a new or distinct use and effecting a material change in the interior or exterior thereof.
>
> **"Alteration and repair"** means any alteration or repair of an existing improvement which does not constitute erection or construction as defined herein.

49 P.S. § 1201(1), (10), and (11). Case law provides that the improvement of real estate has been determined to be erection and construction where the adaptation (1) is substantial enough in its own right to constitute a new structure, or (2) creates a significant change in the use of the existing structure. *City Lighting Products Company v. The Carnegie Institute*, 816 A.2d 1196, 1199–1200 (Pa.Super.2003).

¶ 32 In ruling on the issue of erection and construction versus alteration and repair, the trial court stated:

> Based on the evidence at trial, the [trial c]ourt finds that the extensive demolition and construction work performed by [the Subcontractors] constituted an adaptation of an existing improvement which rendered the building

---

**6.** The Mechanics' Lien Law was amended in 2006, with an effective date of January 1, 2007. However, these actions were filed several years prior to the amendments. Accordingly, we will apply the Mechanics' Lien Law that was in effect at that time.

fit for a new use and effected a material change in the interior of the structure.

The total size of the Project was approximately 206,000 square feet with a total cost of approximately $14 million, including the change orders. (Tr. 202, 481). Carlson's proposal to Citizens Bank described the work to be done as building demolition, cast in place concrete, masonry work, metal work, wood and plastic installation, thermal and moisture protection, new doors and windows, finishes, specialties, fire protection systems, plumbing, heating, ventilation and air conditioning, electrical, data and telecommunications and architectural services. (Plaintiffs' Exhibit 26). During [ ] Wyatt's demolition work, the leased space was essentially gutted leaving only portions in the core of the building remaining. (Tr. 223, 287). More of the core portions of the building could not have been demolished without compromising the structural integrity of the building. (Tr. 288). The total area of construction was a "shell" or "empty space" with concrete floors and exposed columns; the exterior walls were stripped to the fireproofing and the bathrooms were removed. (Tr. 356, 440).

The City of Pittsburgh building permit issued for the Project indicated that the Project was new construction, as did the contracts entered into by [the Subcontractors] with Carlson. (Tr. 88, 120–121, 342, 360; Plaintiffs' Exhibits 24, 44, 61). The Pricing Proposal from Carlson to Citizens generated in December, 2001 referred to a series of drawings entitled "New Construction Plan" for each of the nine floors to be demolished and reconstructed. (Tr. 88).

The cost of the Project, the express references to the work performed as new construction, the type of work performed and the purpose of the Project indicate that the Project was the adaptation of an existing improvement to a new use. Citizens was building its regional headquarters in Western Pennsylvania and changed the building from its prior use accordingly. The premises had not been used for this purpose and the Project was designed to put the premises to a new and distinct use as Citizens' new regional headquarters.

*Wyatt v. Citizens Bank*, 2006 Pa. D. & C. Dec. LEXIS 386, 6–8 (Allegheny).

■ ¶ 33 Citizens argues that this case is factually analogous to *Wentzel–Applewood* and, thus, demands a similar result, *i.e.*, that the subcontractors were engaged in alteration and repair and not in erection and construction. We, and the trial court, disagree.

¶ 34 Citizens and Carlson were also involved in the construction project that led to the *Wentzel–Applewood* litigation. Citizens entered into a contract with Carlson to convert the 11th, 12th, and 13th floors of the 801 Market Street Building from its previous use as retail and storage space for Strawbridge Clothiers into an item processing center on the 11th and 12th floors and office space on the 13th floor. Carlson then subcontracted with various firms to do the actual work, including Wentzel–Applewood, who was to provide and install the drywall, studs, doors, windows, ceilings, and millwork for the item processing center. Wentzel–Applewood completed its work on January 15, 2003. Citizens paid Carlson; however, Carlson never paid Wentzel–Applewood due to Carlson's bankruptcy filing. On March 24, 2003, Wentzel–Applewood provided formal written notice of its intent to file a Mechanics' Lien and did so on May 13, 2003. Citizens filed preliminary objections, which were eventually sustained, and the trial court

struck the Mechanics' Lien. This Court affirmed the trial court's finding that the work did not constitute erection and construction as defined by the Mechanics' Lien Law. Of importance was the testimony of Wentzel–Applewood's principal, which revealed that Wentzel–Applewood viewed the renovations completed on the 11th, 12th, and 13th floors as alterations of the existing building. The renovations, extensive though they were, did not constitute the erection of a "new improvement" or a "substantial addition" to the existing building. We concluded:

> As we have noted, the very testimony of the principal of [Wentzel–Applewood] established that prior to the alterations, the renovated floors were "retail, old space" used as storage in the commercial operations of Strawbridge and Clothier, and that after the construction the floors were used in the commercial operations of Citizens Bank as "office space" and "processing areas." Thus, while the specific activities carried out on the pertinent floors changed, the character of the use of the floors remained the same, namely, a use attendant to the commercial operations of first, Strawbridge and Clothier and subsequently, Citizens Bank. Since, therefore, the renovations do not meet the definition of "Erection and Construction," the work must be viewed as "Alteration and Repair," and appellant was obliged under 49 P.S. § 1501 to have provided, prior to completion of its work, a written preliminary notice of its intention to file a mechanics' lien. The failure of appellant to do so compelled the trial court to sustain the preliminary objections, a ruling which we affirm.

*Wentzel–Applewood,* 878 A.2d at 894.

¶ 35 In the present case, Carlson viewed the Project as erection and construction as evidenced by the subcontracts it entered into with the parties it hired to do the work. The Pricing Proposal from Carlson to Citizens referred to the architectural drawings as a New Construction Plan for each of the nine floors that were demolished. Also, the City issued a work permit for erection and construction for the work associated with the Project. Further, the Project required the complete demolition of the non-core areas on floors 21 through 29. These areas were then rebuilt to specifications requested by Citizens. The work done on the Project in the present case was much more extensive than that done in *Wentzel–Applewood.* Even though the space before the Project was office space, the extensive work done, which included demolition to the point where the non-core areas were on par with new construction, was erection and construction. Once the demolition was completed, the leased space was open, *i.e.,* without walls or ceilings. The Subcontractors then rebuilt the leased space to Citizens' specifications. The Project required a complete upgrade to the electrical system in order to facilitate the newly constructed computer room. Citizens had a monumental staircase constructed between the 28th and 29th floors and, also, required the addition of a rolling file system on the 24th floor, which involved considerable structural support. These changes equated substantial enough change in its own right to constitute a new structure, and, thus, we see no basis to disturb the trial court's factual findings and its legal conclusion that the Project met the definition of erection and construction within the meaning of the Mechanics' Lien Law. *City Lighting Products,* 816 A.2d at 1200; *cf. Wendt & Sons v. New Hedstrom Corp.,* 858 A.2d 631 (Pa.Super.2004) (finding that erection of machinery was final piece of puzzle to create distinct use for plant and effected material change to qualify for erection and construction under Mechanics' Lien Law).

¶ 36 As the work met the definition of erection and construction, the Subcontractors did not have to provide notice of intention to file a Mechanic's Lien prior to completion of their work. Accordingly, we find that Citizens' first three issues are without merit.

¶ 37 In Citizens' fourth and fifth issues, they allege that the trial court erred in not specifying the amount or rate of interest that it awarded to the Subcontractors and should be limited to the post-judgment interest rate pursuant to 42 Pa. C.S.A. § 8101 and 41 P.S. § 202 and should be limited to the date that the judgment was entered.[7]

¶ 38 Regarding interest, our Judicial Code states:

Section 8101. Interest on judgment:

Except as otherwise provided by another statute, a judgment for a specific sum of money shall bear interest at the lawful rate from the date of the verdict or award, or from the date of the judgment, if the judgment is not entered upon a verdict or award.

42 Pa.C.S.A. § 8101. The maximum lawful rate of interest is 6% per annum. 41 P.S. § 201.[8] Citizens argues that the Subcontractors' interest award should correspond to this amount. We agree.

¶ 39 The trial court, in its Pa.R.A.P. 1925(a) opinion, indicated that it was not awarding attorneys' fees, penalties, and interest pursuant to CSPA and limited recovery pursuant to the Mechanics' Lien Law. The Mechanics' Lien Law indicates only that the Subcontractors were entitled to payment of all debts due for labor or materials furnished in the erection or construction. 49 P.S. § 1301. This does include profits, and it equates to amounts on unpaid invoices. *Artsmith Dev. Group v. Updegraff,* 868 A.2d 495 (Pa.Super.2005). As noted *infra,* the trial court correctly determined that CSPA did not apply to Mechanics' Lien Law. Accordingly, the award of interest should be at the lawful statutory rate of 6% per annum and be applied from the date the judgment was entered as per 42 Pa.C.S.A. § 8101. *Cf. Artsmith,* 868 A.2d at 497 (holding Mechanics' Lien statute did not authorize interest amounts). Therefore, we vacate the judgment and remand for modifications pursuant to this Opinion.

*Subcontractors' appeals*

¶ 40 We turn our attention to the appeals of the Subcontractors. Each of the Subcontractors filed a separate appeal from the judgment alleging that the trial court erred in failing to award attorneys' fees as requested. They allege that under CSPA, they were entitled to an award of interest and penalties calculated on the outstanding amount owed, as well as reasonable attorneys' fees and expenses incurred by the litigation to collect the outstanding amount. Four of the Subcontractors present the same argument and rationale. Apostolos takes a different approach as to why attorneys' fees should have been awarded. We address Apostolos' argument first.

*1928 WDA 2007*

¶ 41 Apostolos asks:

Was Carlson the agent of Citizens under the Mechanics' Lien Law 49 P.S. § 1407 for purposes of applying the provisions of the Contractor and Subcontractor Payment Act 73 P.S. §§ 501 *et seq.?*

---

7. The trial court's order was silent as to the interest rate and awarded prejudgment interest. Trial court order, 9/17/2007.

8. The exceptions to the lawful rate of interest are listed in Article III of Title 41 of the Pennsylvania Statutes.

Appellant Apostolos' brief, 1928 WDA 2007, at 5.

¶ 42 Apostolos alleges that the evidence presented in this litigation established that Carlson was not the Contractor for the Project but was an agent of Citizens and thus raised Apostolos from a subcontractor to a contractor with Citizens. Apostolos points to the testimony of James B. Wheeler, who was employed as Citizens' construction manager for the Project, at deposition where he acknowledged that Carlson was acting as Citizens' agent. Further, Apostolos notes that Carlson and Citizens never signed the AIA contract nor did Citizens require Carlson to post bond to protect the subcontractors working on the Project. The AIA contract, which Citizens and Carlson agreed was controlling although never signed, indicated that final payment was to be made from Citizens directly to the subcontractors working on the Project. However, Citizens made final payment to Carlson. Apostolos posits that because of Mr. Wheeler's control over the Project and the questionable practices regarding the contract, Carlson was merely an extension of Citizens and was not a "true" contractor.

¶ 43 First, as we note below, Apostolos did not present in its complaint a breach of contract claim that would involve CSPA; it merely asserted a Mechanics' Lien claim, which as we discuss, is a separate and distinct claim.

¶ 44 Second, the trial court reviewed the definitions in CSPA and found that Carlson was the contractor and Citizens was the owner. CSPA defines "owner" as a "person who has an interest in the real property that is improved and who ordered the improvement to be made...." 73 P.S. § 502. CSPA defines "contractor" as a "person authorized or engaged by an owner to improve real property" and defines "subcontractor" as a "person who has contracted to furnish labor or materials to, or has performed labor for, a contractor or another subcontractor in connection with a contract to improve real property." *Id.* The trial court found Citizens was an owner and Carlson was a contractor as defined by CSPA. We agree.

¶ 45 The Subcontractors entered subcontract agreements with Carlson. At all times, Carlson was the intermediary between Citizens and the Subcontractors. The Subcontractors submitted all paperwork and invoices to Carlson. Citizens submitted all change requests to Carlson. Citizens and the Subcontractors did not have any interaction. Further, we do not find that the agreement between Citizens and Carlson was a sham. Accordingly, we find Apostolos' appeal at 1928 WDA 2007 lacks merit.

*1921, 1929, 1930, & 1931 WDA 2007*

¶ 46 The remaining four subcontractors each present essentially the same question on appeal:

> Where Pennsylvania's Mechanics' Lien Law of 1963, 49 P.S. §§ 1101 *et seq.*, provides that a claimant may obtain a lien for "all debts due," did the trial court err in failing to award [Subcontractors their] attorneys' fees and the interest and penalty amounts recoverable under Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. §§ 501 *et seq.?*

Appellant Mendel Steel's brief, 1929 WDA 2007, at 5; *see also* Appellant Wyatt's brief, 1921 WDA 2007, at 3 (semble); Appellant Lighthouse's brief, 1930 WDA 2007, at 5 (semble); Appellant Huckenstein's brief, 1931 WDA 2007, at 5 (semble). We address these appeals contemporaneously.

¶ 47 As stated *supra*, the Subcontractors' complaints included requests for attorneys' fees, penalties, and interest pursu-

ant to CSPA. The trial court held that such requests are not proper in a Mechanics' Lien action. We agree.

■ ¶ 48 Pennsylvania's Mechanics' Lien Law provides for payment of all debts due associated with the labor and material costs furnished in the erection or construction. 49 P.S. § 1301. A Mechanics' Lien may be had only on a debt for work done or for materials furnished, and not for unliquidated damages for breach of a contract. *Alan Porter Lee, Inc. v. Du-Rite Products Co.*, 366 Pa. 548, 79 A.2d 218 (1951).

■ ¶ 49 CSPA delineates, *inter alia*, the conditions that entitle a contractor or subcontractor to payments under a construction contract, covers the payment obligations between and among property owners, contractors, and subcontractors, and sets forth deadlines for the making of payments and consequences for failures to pay. *Stivason v. Timberline Post & Beam Structures Co.*, 947 A.2d 1279, (Pa.Super.2008). CSPA states that an owner shall pay the contractor strictly in accordance with the terms of the contract. 73 P.S. § 505(a). It also states that the subcontractor shall be paid by the party with whom it contracted. 73 P.S. § 507(a). Therefore, in order to seek funds under CSPA, the party must bring a breach of contract action.

■ ¶ 50 In the present case, the Subcontractors brought a Mechanics' Lien action. In one paragraph, they merely requested attorneys' fees, penalties, and interest pursuant to CSPA. This request is not enough to bring forth a new cause of action.

■ ¶ 51 The Subcontractors argue that the provisions of CSPA should be read in conjunction with the Mechanics' Lien Law. However, the Mechanics' Lien Law is a specific action. A Mechanics' Lien is a statutorily created lien for the purpose of securing priority for payment for work performed or materials provided in erecting or repairing a building. *Schwartz v. Whelan*, 295 Pa. 425, 145 A. 525 (1929). The Mechanics' Lien Law is intended to protect prepayment labor and materials that a contractor invests in another's property by allowing the contractor to obtain a lien interest in the property involved; a lien proceeding is not intended to settle the contractual obligations of the parties. 49 P.S. §§ 1101 *et seq.*

■ ¶ 52 A Mechanics' Lien creates a lien, which is limited by statute to amount owed for work and materials, plus, through decisional law, profits. *See Artsmith*, 868 A.2d at 497. A mechanics' lien is not the basis for recovery of unliquidated damages for breach of contract, and a mechanics' lien proceeding is not intended to settle the contractual obligations of the parties. *Id.*, 868 A.2d at 497. A Mechanics' Lien action is distinct from a breach of contract action seeking remedies pursuant to the CPSA, which adds penalties, interest, and attorneys' fees. The two actions protect contractors in different manners. We do not want to permit a Mechanics' Lien to encumber property in an amount that exceeded the work done. This would be at cross-purposes with the Mechanics' Lien Law. Therefore, we find that a contractor and subcontractor cannot include attorneys' fees, penalties, and interest pursuant to CSPA in a Mechanics' Lien action.[9] Accordingly, the Subcontractors appeals at 1929 WDA 2007, 1921 WDA 2007, 1930 WDA 2007, and 1931 WDA 2007 fail.

---

9. As noted in *Artsmith,* a civil action is not barred by the pendency of an action *in rem* upon a Mechanics' Lien, nor is the Mechanics' Lien claim barred by the pendency of the civil action; a plaintiff has the liberty to proceed against the property at the same time that he resorts to a personal action against the defendant. *Artsmith,* 868 A.2d at 497 n.

¶ 53 In conclusion, we find that the trial court did not abuse its discretion in finding that the Project met the definition of erection and construction pursuant to the Mechanics' Lien Law. However, we find that the trial court's judgment was in error in that the interest amount was not specified and in that it awarded prejudgment interest. We vacate the judgment and remand for a recalculation of the lien to include the statutory interest pursuant to § 8101 of the Judicial Code from the date of judgment. Further, we find that the Subcontractors' CSPA claims for attorneys' fees, penalties, and interest were not available through a Mechanics' Lien action.

¶ 54 Judgment vacated. Case remanded for recalculation of lien to include statutory amount for interest on judgment from date of judgment. Jurisdiction relinquished.

1. Notwithstanding, the plaintiff is limited to one ultimate satisfaction, *i.e.,* he cannot recover twice for the same loss. *Id.,* 868 A.2d at 497 n. 1.