J-A24036-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | |
|---|---|
| JOHN P. COBB AND NANCY M. COBB | : IN THE SUPERIOR COURT OF |
| | : PENNSYLVANIA |
| v. | : |
| | : |
| KEEN LAKE CAMPING & COTTAGE | : |
| RESORT, INC., KLCCR, LLC AND RICE | : |
| COAL COMPANY, THEIR HEIRS, | : |
| ADMINISTRATORS, SUCCESSORS, AND | : |
| ASSIGNS, AND ANY AND ALL OTHER | : |
| PERSONS CLAIMING ANY RIGHT, TITLE | : |
| OR INTEREST IN OR TO THE HEREIN- | : |
| DESCRIBED REAL PROPERTY OTHER | : |
| THAN PLAINTIFFS, WHOSE IDENTITY | : |
| OR IDENTITIES ARE UNKNOWN | : |
| | : |
| APPEAL OF: JOHN P. COBB | : No. 110 EDA 2015 |

Appeal from the Judgment Entered December 30, 2014
in the Court of Common Pleas of Wayne County,
Civil Division at No(s): 266-Civil-2012

BEFORE:    PANELLA, WECHT, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:    **FILED OCTOBER 30, 2015**

John P. Cobb[1] appeals from the December 30, 2014 judgment[2] entered

in favor of defendant KLCCR, LLC, following a non-jury trial in this boundary

dispute case.  We affirm.

Keen's Lake, also known as Keen's Pond, is a body of water located in

Canaan Township, Wayne County, Pennsylvania.  The lake was originally

---

[1] With respect to the land at issue, John and Nancy Cobb were tenants by the entireties.  Nancy Cobb passed away during the course of the litigation.

[2] The December 30, 2014 judgment was entered, following the denial of Cobb's post-trial motion, upon the trial court's August 6, 2014 order directing the entry of judgment.

* Retired Senior Judge assigned to the Superior Court.

enclosed within a 114-acre parcel of land conveyed to Jacob Keen in 1847. That parcel subsequently was split among other property owners, including Keen, Cobb, Yander, and Keenan. At present the lake, and much of the land surrounding it, is used by campers. We offer the following diagram to aid in understanding the descriptions of the land disputes discussed hereafter.[3]



The Keen land at issue is a pentagon-shaped parcel of approximately five acres, which was carved from the parent parcel in 1851 and transferred to the D&H Canal Company. James L. Keen and Dorothy Keen took title to

_____

[3] The diagram includes a portion of KLCCR's Trial Exhibit 7, modified to add elements of Cobb's Trial Exhibits 7 and 8. This is offered merely to aid the discussion, may not be to scale, and is not intended to be an authoritative representation of the parties' ownership rights.

that parcel in 1970.  In 2001, the four daughters of James and Dorothy Keen obtained the property, and formed KLCCR for the purpose of running the campground.

The Cobb parcel at issue (referred to by the parties and trial court as "Parcel Two") was transferred in 1949 from Charles E. Keen to James and Theresa Cobb.[4]  The property description included in the deed for Parcel Two is the following: beginning at the point where the creek crosses the old road, thence northeast for approximately 224 feet to another point in the center of the road; "thence south ten degrees one minute west to the low[-]water mark in Keen's pond; thence in a general southwesterly direction following the said low water mark in Keen's pond three hundred ninety-nine feet to a stake and stones;" then north ten degrees one minute east back to the beginning point.  Cobb's Trial Exhibit 12 (repetition of numbers omitted).  Cobb obtained the land from Theresa, his mother, in 1974.  The description of Parcel Two provided in the deed creates an overlap onto KLCCR's five-acre parcel.

Yander owns land south of the KLCCR parcel which is along the eastern shore of Keen's Lake.  Keenan's land is south of the Yander parcel, and also borders the lake.  In the 1970s, a dispute arose between Keen and Cobb on

---

[4] Cobb also asserted title to another parcel located above the road, referred to by the parties as "Parcel One."  By court order reflecting the agreement of the parties, judgment was entered prior to trial in favor of Cobb and against all defendants as to this parcel.  *See* Order, 9/4/2013.

the one hand, and Yander and Keenan on the other, regarding use of the lake.

In 1972, Keen and Cobb together sued Yander and Keenan in equity, claiming that the defendants and their guests were trespassing upon lands covered by Keen Lake that were owned by Keen and Cobb. The litigation resulted in a final order declaring that Keen Lake's western zero-foot contour line was the line of demarcation between the lands of Yander and Keenan to the east, and the lands of Keen and Cobb to the west. Specifically, the order provided that title to Keen's Lake west of the western zero-foot contour line thereafter belonged to the Keens "except for so much thereof as is included in" the Cobbs' 1949 deed. Cobb's Trial Exhibit 22.

From the time he obtained the land from his mother, Cobb used the overlap parcel. He gave permission to a utility company to install a pole on the overlap parcel in 1976. At some point in the 1990s, Cobb put up a fence in the overlap to keep campers from straying onto his land; he did not seek permission and received no objections. When James Keen drained the lake in 1991 to repair the dam, Cobb performed some work on the lake bed. N.T., 9/3/2013, at 144. In 1996, he gave James Keen permission to pave a portion of the overlap parcel; Cobb testified that he plowed the road in the winter, mowed the grass in the summer, and used the road when he fished in the lake.

However, Keen/KLCCR employee Anita Lee testified that she oversaw and participated in the upkeep of the overlap area by maintaining the road, putting up fences, trimming trees, and rebuilding campsites; never in her 27 years there did she see Cobb perform any such maintenance. Similarly, the president of KLCCR testified that the Keens, not Cobb, used and maintained the overlap parcel as part of their campsite business.

After obtaining title to the land in 2009, KLCCR hired Joseph Barrett to survey its property, resulting in the discovery of the overlap with Cobb's parcel. Thereafter, Cobb retained Alfred Bucconear to conduct a survey of Cobb's property lines. Cobb then filed a complaint for quiet title and ejectment against KLCCR, Keen Lake Camping, and Rice Coal Company.[5] KLCCR answered and filed ejectment and quiet title counterclaims against Cobb. Cobb eventually obtained a default judgment against all defendants other than KLCCR.

The case proceeded to a non-jury trial on claims regarding Parcel Two. On August 6, 2014, the trial court entered an order (1) finding in favor of "Defendants" and against Cobb, and (2) determining that Cobb's Parcel Two is limited to the area outside the boundaries of KLCCR's land as determined by Barrett's 2009 survey (*i.e.*, the overlap parcel belongs to KLCCR). Cobb timely filed a post-trial motion seeking JNOV or a new trial. After conducting

---

[5] Rice Coal Company was one of the predecessors in title to the Keens and KLCCR. Cobb's Brief at 11.

a hearing, the trial court denied Cobb's motion by order of December 3, 2014. Judgment was entered on December 30, 2014, and Cobb timely filed a notice of appeal.

Cobb presents this Court with the following questions which we have reordered for ease of disposition:

1. Did the trial court err as a matter of law in failing to find that Cobb has title to all of Parcel Two when the 1949 deed in Cobb's chain of title establishes that Cobb owns to the low water mark, the September 11, 1975 Order establishes the zero contour line as both the low[-]water mark and the line of demarcation, and the trial court recognized that the September 11, 1975 Order confirmed title to Cobb's property in accordance with the 1949 deed?

2. Did the trial court err as a matter of law in failing to find that Cobb has title to Parcel Two by virtue of the doctrine of consentable lines when Cobb and Keen consented to a boundary line that gave Cobb all of Parcel Two and the trial court found that Cobb has claimed the entirety of Parcel Two since 1974 through his actions in fencing and posting this parcel, granting permission to have a PPL pole and overhead lines installed on this parcel, and granting permission to pave the access road on this parcel?

3. Did the trial court err as a matter of law in precluding Cobb from testifying under the Dead Man's Act to statements made by, and agreements made with, deceased prior owner James Keen when James Keen had no actual interest in the claims in dispute, neither Keen Lake Camping nor KLCCR is the legal representative and/or heir of James Keen, and Keen Lake Camping and KLCCR waived the protections of the Dead Man's Act by engaging in discovery?

4. Did the trial court err as a matter of law in denying Cobb's motion for a new trial based upon after-discovered evidence in the form of an Amended Complaint and map in the 1972 litigation when Mr. Bucconear discovered the evidence in

the Courthouse basement after the trial concluded, and this evidence clearly shows the low[-]water mark being the line of demarcation linking the zero contour?

5.    Did the trial court err as a matter of law in directing the entry of judgment in favor of defendants, including Keen Lake Camping and Rice Coal Company, and in determining that Cobb's Parcel Two is limited to the area set forth in the 2009 survey by Joseph Barrett, when the trial court previously directed the entry of judgment against all defendants except KLCCR and the 2009 Barrett survey does not define what property Cobb owns?

Cobb's Brief at 4-5 (trial court answers omitted).

We begin with our standard of review.

Our appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law.  The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury.  We consider the evidence in a light most favorable to the verdict winner.  We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.  However, [where] the issue ... concerns a question of law, our scope of review is plenary.

*Wyatt Inc. v. Citizens Bank of Pennsylvania*, 976 A.2d 557, 564 (Pa. Super. 2009) (quoting *Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 568 (Pa. Super. 2005)).

Cobb first challenges the trial court's ruling as to the portion of Parcel Two which lies under the waters of Keen's Lake.  As noted above, the 1949 deed indicates that Parcel Two extends from the point where the creek crosses the old road, thence northeast for approximately 224 feet to another

point in the center of the road; "thence south ten degrees one minute west to the low[-]water mark in Keen's pond; thence in a general southwesterly direction following the said low water mark in Keen's pond three hundred ninety-nine feet to a stake and stones;" then north ten degrees one minute east back to the beginning point. Cobb's Trial Exhibit 12 (repetition of numbers omitted).

Cobb insists that the low-water mark is the same thing as the zero-foot contour line which the trial judge in 1975 determined was the line of demarcation between the property of Keen and Yander. He argues that the low-water mark cannot be the shoreline, because he could not have been a plaintiff in the action against Yander and Keenan if he had not owned land which was under the waters of Keen's Lake, as that case dealt solely with trespass on the waters of the lake. Cobb's Brief at 32-33. Citing Black's Law Dictionary, Cobb maintains that "[c]ommon sense dictates that the low[-]water mark of a body of water is… the lowest point to which water sinks." Cobb's Brief at 31.

The trial court disagreed, and so do we. Consideration of the following definition of watermark in Black's Law Dictionary reveals that it refers not to the highest and lowest topographical points of a body of water; rather it reflects the differing shorelines that result from the changing volume of the body of water.

**1.** A mark indicating the highest or lowest point to which water rises or falls.

> ***high-water mark.*** **1.** The shoreline of a sea reached by the water at high tide. ● The high-water mark is usu. computed as a mean or average high tide and not as the extreme height of the water. **2.** In a freshwater lake created by a dam in an unnavigable stream, the highest point on the shore to which the dam can raise the water in ordinary circumstances. **3.** In a river not subject to tides, the line that the river impresses on the soil by covering it long enough to deprive it of agricultural value. — Also termed *high-water line*.

> ***low-water mark.*** **1.** The shoreline of a sea marking the edge of the water at the lowest point of the ordinary ebb tide. **2.** In a river, the point to which the water recedes at its lowest stage.

Black's Law Dictionary at 1623 (8th ed. 2004).

It is clear that the low-water mark of Keen's Lake is the line which becomes the shoreline when the volume of water in the lake sinks to its low point. It is not, as Cobb proposes, the point where the lakebed dips down closest to the center of the earth. As KLCCR's expert explained, the reason deeds for properties along a body of water were made to the low-water mark was to guarantee access to the water: "back in the day when you needed cattle to be able to get to the water to drink, they would make it to the low[-]water mark so they weren't standing four f[ee]t back" when the water was at its low point. N.T., 9/3/2013, at 243.

The language of the deed further demonstrates the correctness of the trial court's determination. According to the 1949 deed, the southwestern

point of Cobb's property is a spot on the low-water line marked by a stake and stones. As KLCCR's surveyor Barrett explained, "you're never going to find a stake and stones in the middle of the lake in 1949 when this deed was written." *Id.* at 267.

Unless the volume of water in Keen's Pond is at its lowest, Cobb owns land that is under water. At all other times, his boundary line is not the shoreline, and he in fact owns land that is under the water. Thus, there is no merit to his argument that he could not have been a plaintiff to the 1972 action unless the low-water mark is the zero-foot contour line.

Moreover, the 1975 order which concluded the 1972 case does not purport to define the boundaries of Cobb's land. Rather, it provides that the portion of Keen's Lake that lies west of the western zero-foot contour line belongs to Keen, except as provided in Cobb's deed. Cobb's deed indicates that his property extends to the low-water mark, not to the zero-foot contour line. Accordingly, the trial court's ruling in the instant case does not conflict with the 1975 order.

The trial court's determinations that the low-water mark and the zero-foot contour line are not the same, and that Cobb's land below the waters of Keen's Lake extends only to the low-water mark, are a result of the correct application of the law to factual findings that are supported by the record. Hence, Cobb's first issue warrants no relief.

With his next two issues, Cobb claims that the trial court erred in determining that KLCCR owns the overlap parcel. He argues that the evidence that was admitted showed that he has title to that land under the doctrine of consentable lines.[6] Cobb's Brief at 37-40. Further, he maintains that the trial court improperly excluded under the Dead Man's Act additional evidence relevant to his consentable-line claim. *Id.* at 40-48.

This Court has summarized the law regarding the doctrine of consentable lines as follows:

> The establishment of a boundary line by acquiescence for the statutory period of twenty-one years has long been recognized in Pennsylvania to quiet title and discourage vexatious litigation. Based upon a rule of repose sometimes known as the doctrine of consentable line, the existence of such a boundary may be proved either by dispute and compromise between the parties or recognition and acquiescence by one party of the right and title of the other. …
>
> "Acquiescence," in the context of a dispute over real property, denotes passive conduct on the part of the lawful owner consisting of failure on his part to assert his paramount rights or interests against the hostile claims of the adverse user. A determination of consentable line by acquiescence requires a finding 1) that each party has claimed the land on his side of the line as his own and 2) that he or she has occupied the land on his side of the line for a continuous period of 21 years. … [W]hen a consentable line is established, the land behind such a line becomes the property of each neighbor regardless of what the deed specifies. In essence, each neighbor gains marketable

---

[6] Cobb's expert conceded that KLCCR has superior title to the overlap parcel by virtue of the 1851 deed which originally carved out its pentagon-shaped parcel, N.T., 9/3/2013, at 105, and that the overlap parcel thus was not given to Cobb by the 1975 order, *id.* at 112-13.

- 11 -

title to that land behind the line, some of which may not have been theirs under their deeds.

***Moore v. Moore***, 921 A.2d 1, 4-5 (Pa. Super. 2007) (quotations and citations omitted).

Cobb claims that he established ownership of the overlap parcel both by dispute and compromise and by acquiescence. Cobb argues that the following evidence proved (1) circumstantially that he and Keen had agreed to Cobb's ownership of the overlap parcel and acted accordingly for more than 21 years, and (2) Keen's acquiescence in Cobb's ownership of the overlap parcel for more than 21 years:

> Cobb's (and not Keen's) giving PPL permission, in June of 1976, to put a pole with overhead utilities on Overlap Parcel Two in order to provide service to Keen; Cobb's putting up approximately three sections of round rail fence on Overlap Parcel Two without any permission or objections from Keen; Cobb's posting "No Trespassing" signs on Parcel Two beginning in 1974 or 1975; Cobb's giving Keen permission to pave the access route located on Overlap Parcel Two; Keen Lake Camping's naming Cobb as an additional insured on its insurance policy with respect to Overlap Parcel Two; Cobb's giving Keen permission to maintain the driveway, cut the grass and pick up garbage on Overlap Parcel Two; Cobb's going out into the waters of Keen Lake when the lake was drawn down in 1994, removing sediment from the bottom of the lake and fixing the shoreline and bank, without objections from anyone; and Cobb's accessing Keen Lake by boat from Parcel Two and fishing in Keen Lake on a weekly basis during the summer and winter months.

Cobb's Brief at 38 (citations omitted).

Cobb has failed to convince us that this evidence requires a finding that the Keens agreed or acquiesced to his ownership of the overlap parcel.

- 12 -

First, several of these highlighted pieces of evidence do not even support his position. Specifically, Cobb's being listed as an additional insured on KLCCR indicates not that Cobb was the owner of the overlap parcel, but rather that KLCCR owned the land and Cobb was a permissive user. Further, as we have discussed, Cobb's deed gives him to the low-water mark of the lake, and includes the land normally under the water near the shoreline.[7] Therefore, Cobb did not leave the bounds of land that is acknowledged to belong to him when, while Keen's Lake was drained, he went into the lakebed to fix the shoreline and bank in front of his home.

More importantly, however, Cobb ignores the evidence that the Keens and KLCCR also treated the overlap parcel as their property during the same time period. Anita Lee, who worked on the maintenance crew at the Keens' campground from 1987 until the time of trial, testified that it was the Keens who maintained and improved the disputed overlap parcel during her tenure by mowing and clearing debris therefrom, cutting trees, rebuilding campsites and fencing, keeping up the electric and water lines, and maintaining the paved area. N.T., 4/30/2014, at 9. Ms. Lee never saw Cobb perform any maintenance in the area, and he never informed her that he owned that land or objected to the Keens' activities thereupon. *Id.* at 8.

---

[7] According to the map admitted as Cobb's trial exhibit P-6, the low-water mark is roughly along the 9-foot contour line.

- 13 -

Jennifer Wertz, daughter of James and Dorothy Keen and president of KLCCR, testified that she worked on the campground as a child, and has been employed there full-time since graduating from college in 1978. *Id.* at 15. Ms. Wertz indicated that, since the Keens obtained the property in 1970, they initially filled in land within the overlap area so it could be used for campsites and added electricity. *Id.* a 20. Thereafter, the Keens continued to enlarge the area within the overlap parcel used for campsites, paved roadways, and added additional electric and water lines as well as picnic tables. *Id.* The cost of installing the utility pole in the overlap area about which Cobb makes much ado was paid for by James Keen. *Id.* at 21. The Keens allowed Cobb to use the lake for fishing because they were neighbors. *Id.* at 22. At no time between 1974 and 2009 did Cobb ever claim ownership in any portion of the overlap area which the Keens used for campsites. *Id.*

From this evidence, the trial court was well within its discretion to conclude that the Keens neither recognized a line along the overlap parcel as the boundary between their and Cobb's properties nor acquiesced to any such line. Evidence that each party treated the property at issue as his own simply does not establish a boundary by consentable line. *Cf. Plauchak v. Boling*, 653 A.2d 671, 676 (Pa. Super. 1995) (holding that boundary by consentable line was established where hedge row was planted by one

property owner in 1957 "for the specific purpose of creating a visible demarcation separating what he viewed as his property from that portion of his neighbors' land" and "[n]one of the subsequent owners in either [party's] chain of title disputed the propriety of this hedge row boundary from 1957 until at least 1989[, during which time the owners all] recognized the hedge row as the true and correct border between the properties and acted accordingly").

Cobb further argues that the trial court erred in refusing to allow his testimony about an agreement he and James Keen reached during the 1970s litigation. Cobb claims that such testimony would have established the dispute-and-compromise prong of a boundary by consentable line. Cobb's Brief at 28. The trial court prohibited such testimony under the Dead Man's Act.

> The so-called Dead Man's Act, [42 Pa.C.S. 5930,] provides, *inter alia*, an exception to the general rule of competency and disqualifies as a witness a surviving or remaining party or other person whose interest is adverse to one who is dead and proscribes any testimony by such party or person against the deceased as to matters which occurred before death if the deceased had any right in the subject matter which has passed to a party of record. …[T]hree conditions must exist before any such witness is disqualified: (1) the deceased must have had an actual right or interest in the matter at issue…; (2) the interest of the witness - not simply the testimony - must be adverse; (3) a right of the deceased must have passed to a party of record who represents the deceased's interest.

*In re Matthews' Estate*, 246 A.2d 412, 416 (Pa. 1968) (footnote, quotation marks, and citations omitted). The purpose of the statute is to avoid "the injustice that would result from permitting a surviving party to a transaction to testify favorably to himself and adversely to the interest of the decedent when the representative of the decedent would be hampered in attempting to refute the testimony by reason of the death of the decedent." *In re Estate of Cecchine*, 485 A.2d 454, 458 (Pa. Super. 1984) (internal quotation marks and citation omitted). "The theory is that because the decedent's representative is unable to present evidence regarding the transaction, the other party to the transaction should be similarly restricted." *Id.*

Although not recently, our Supreme Court has held that the Dead Man's Act prohibits a claimant to a decedent's property under the doctrine of consentable lines from testifying about any agreement the decedent made during his lifetime. *Reiter v. McJunkin*, 45 A. 46, 47 (Pa. 1900); *accord Lieber v. Eurich*, 192 A.2d 159, 160 (Pa. Super. 1963) ("Claimants to property by adverse possession are incompetent to testify if the owner or grantor of the property is deceased."). However, this law is applicable only if James Keen had an interest in the matter at issue and KLCCR represents James Keen's interest.

"[I]t is not essential that the party asserting the dead man's rule be the nominal representative of the decedent; it is required, rather, that he represent the *interest* of the decedent."[8] **Estate of Cecchine**, 485 A.2d at 457 (emphasis in original). If the party asserting the Act holds the rights of the decedent through an *inter vivos* grant from the decedent, the Act renders incompetent the testimony of the party claiming the granted property. **See Long v. Long**, 65 A.2d 683, 684 (Pa. 1949) ("[A] person challenging a *prima facie* valid title of a grantee by attempting to negate the grantor's right to make such conveyance is asserting an interest adverse to the grantor and, if the grantor is dead, the [Dead Man's Act] renders the challenger incompetent to testify in such action as to any matters occurring prior to the grantor's death.").

Here, the four Keen daughters purchased the property from their parents on April 1, 2001, shortly before James Keen died. N.T., 4/30/2014, at 15. In 2009, the sisters transferred the property to KLCCR, a company owned by the four of them. **Id.** at 18. Thus, James Keen once had actual rights in the overlap parcel, and KLCCR now holds those rights. Because

---

[8] **Accord Diel v. Beekman**, 499 P.2d 37, 47 (Wash. App. 1972), *overruled on other grounds by* **Chaplin v. Sanders**, 676 P.2d 431 (Wash. 1984) ("Our statute renders a party-in-interest incompetent to testify to transactions with a deceased when his adversary represents **or claims through the deceased**.") (emphasis added); **Zych v. Zych**, 163 N.W.2d 882, 885 (Neb. 1969) (noting that the party of record who represents the interests of the decedent includes "any person who has succeeded to the rights of the decedent, either by purchase, descent, or by operation of law").

James Keen is dead, Cobb is incompetent to testify in this action about matters occurring between Cobb and James Keen prior to Keen's death which would negate Keen's right to have transferred the overlap parcel to his daughters. Accordingly, the trial court properly held that the Dead Man's Act applies to Cobb's proposed testimony. **Reiter**, 45 A. at 47 ("The right of Grubbs had passed to the plaintiff. Grubbs was dead. The defendant therefore was incompetent as a witness to prove an agreement for a consentable line between him and Grubbs in his lifetime.").

Cobb argues that even if the Dead Man's Act is applicable, KLCCR waived its protections by engaging in discovery. Cobb's Brief at 46. It is Cobb's position that KLCCR waived any objection to his proposed testimony "by serving written interrogatories on Cobb and by taking Cobb's deposition" during which KLCCR's counsel "specifically inquired into matters that occurred prior to James Keen's death, including the verbal agreement between Cobb and James Keen." Cobb's Brief at 47 (citations omitted).

Cobb relies upon the following in support of his position: "when a decedent before he died or a decedent's representative has required an adverse party to be deposed or to answer interrogatories, any objection based upon the Dead Man's Act to the competency of such a party to testify at the trial is waived, even though the discovery is not offered in evidence."

*Schroeder v. Jaquiss*, 861 A.2d 885, 889 (Pa. 2004) (citing *Anderson v. Hughes*, 208 A.2d 789 (Pa. 1965)).

As KLCCR notes, nothing in Cobb's pleadings makes reference to any agreement he had with James Keen about a consented-to boundary line; KLCCR therefore had no idea that Cobb was going to seek to testify about an agreement he reached with James Keen in the 1970s until its discovery revealed it.  KLCCR's Brief at 15.  We hold that, under these circumstances, the trial court's ruling is not "a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous."  *Zuk v. Zuk*, 55 A.3d 102, 112 (Pa. Super. 2012). Therefore, we conclude that the trial court properly held that the Dead Man's Act precluded Cobb from testifying that James Keen consented to Cobb's ownership of the overlap parcel.  Cobb's third issue warrants him no relief.

Next, Cobb claims that the trial court erred in denying him a new trial based upon the post-trial discovery of an amended complaint and map filed in the 1972 action.  Cobb's Brief at 50.  Cobb acknowledges that the documents were found in the courthouse as part of the case file.  *Id.*

"[T]he granting or refusal of a new trial based on after-discovered evidence is an area addressed to the sound discretion of the court and the exercise of this discretion by the court will be reversed only where it has been clearly abused."  *Mar Ray, Inc. v. Starr*, 452 A.2d 739, 743 (Pa.

Super. 1982). "The legal requirements for the grant of a new trial based upon after-discovered evidence are well established: the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would likely compel a different result." *Daniel v. Wyeth Pharm., Inc.*, 15 A.3d 909, 916 (Pa. Super. 2011).

The trial court denied Cobb's motion upon its determination that the documents "could have been easily discovered with the exercise of due diligence." Supplemental Trial Court Opinion, 3/11/2015, at 4. It noted that the after-discovered evidence was listed on the docket in the 1972 case which was "repeatedly referenced during the course of the trial" and "is and was always a matter of public record…." *Id.* We discern no abuse of discretion in the trial court's ruling. *Cf. Drake Mfg. Co. v. Polyflow, Inc.*, 109 A.3d 250, 261 (Pa. Super. 2015) ("[T]he trial court erred by admitting evidence during the post-trial stage that Drake could easily have submitted during trial."). Accordingly, no relief is due.

With his final issue, Cobb claims two errors in the trial court's August 6, 2014 order of judgment. First, Cobb argues that the trial court erred in ordering judgment in favor of all defendants because it had previously ordered the entry of judgment against all defendants as to Parcel One, and

against all defendants other than KLCCR as to Parcel Two. Cobb's Brief at 48. Second, Cobb objects to the order's reliance upon the 2009 Barrett survey as establishing the boundaries of Cobb's property. He claims this reliance was in error because Barrett surveyed KLCCR's property, not Cobb's, and the survey does not indicate where the low-water mark is located. *Id.* at 49.

As to Cobb's former argument, the docket and record clearly reflect that judgment was entered (1) on September 4, 2013, in favor of Cobb and against all defendants as to Parcel One; (2) on September 4, 2013 in favor Cobb and against all persons claiming right, title, or interest in the real property described in Cobb's complaint other than KLCCR.[9] Thus, the docket establishes that the only one of the defendants still litigating at the time of the August 6, 2014 judgment was KLCCR. Accordingly, the judgment entered on August 6, 2014 applies only to KLCCR, despite the use of "Defendants" rather than "Defendant" in the order.[10]

---

[9] This September 4, 2013 order mistakenly excludes Keen Lake Camping & Cottage Resort, Inc., rather than KLCCR, from the persons against whom judgment is thereby entered. However, the parties subsequently stipulated to the correction, and the stipulation was made an order of court on October 30, 2013.

[10] In the unlikely event that Rice Coal Company or Keen Lake Camping & Cottage Resort, Inc. should claim in the future that it obtained judgment in its favor by virtue of the August 6, 2014 order, this memorandum serves to establish otherwise.

Regarding Cobb's second complaint with the final judgment, the order provides that Parcel Two, as created by the 1949 deed, is

> limited to the area set forth in the 2009 survey by Joseph Barrett, PLS, which lies between the Township Road and the low[-]water mark as identified in the April 16, 1949 [deed], recorded in Wayne County Deed Book 171 at page 635, as being the stake and stone corner and lands of Defendant KLCCR, LLC.

Order, 8/6/2014.

Because neither the "stake and stone corner" nor the low-water mark is shown on Barrett's 2009 survey, the trial court's order provides, in effect, that Cobb owns everything stated in the Cobbs' 1949 deed **except the overlap parcel**, which belongs to KLCCR. That does not change the fact that Cobb's Parcel Two west of KLCCR's land extends to the low-water mark in Keen's Lake. Although the trial court correctly determined where the low-water mark is not (*i.e.*, it is not the zero-foot contour line), neither party offered evidence to allow the trial court to determine where the low-water mark actually is. As such, the trial court did not err in relying upon the language of the deed, rather than a non-existent survey or map, to describe the southern boundary of Cobb's land.

Thus, Cobb has failed to convince us that the trial court's August 6, 2014 order is erroneous and merits relief from this Court. *The York Grp., Inc. v. Yorktowne Caskets, Inc.*, 924 A.2d 1234, 1246 (Pa. Super. 2007)

("[T]he appealing party bears the burden of establishing that the trial court's decision is erroneous.").

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary


Date: 10/30/2015