J-A11017-25
J-A11018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| ELIZABETH A. GLASS | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MICHELE E. DELONG, | : | |
| ADMINISTRATRIX OF THE ESTATE OF | : | |
| JEFFREY A. GEORGE, DECEASED | : | No. 1454 MDA 2024 |
| | : | |
| Appellant | : | |

Appeal from the Order Entered July 12, 2024
In the Court of Common Pleas of Berks County Orphans' Court at No(s):
0621-2387

| ELIZABETH A. GLASS | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ESTATE OF JEFFREY A. GEORGE | : | |
| | : | |
| Appellant | : | No. 1472 MDA 2024 |

Appeal from the Order Entered July 15, 2024
In the Court of Common Pleas of Berks County Civil Division at No(s):
22-1085

BEFORE:   MURRAY, J., KING, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY KING, J.:                    **FILED SEPTEMBER 08, 2025**

Appellants, Michele E. DeLong ("Ms. DeLong"), Administratrix of the

Estate of Jeffrey A. George (deceased), and the Estate of Jeffrey A. George,

---

[*] Former Justice specially assigned to the Superior Court.

("Estate"), appeal from the orders entered in the Berks County Court of Common Pleas Civil Division on July 15, 2024, and the Berks County Orphans' Court on July 12, 2024,[1] entering a verdict in favor of Appellee, Elizabeth A. Glass.  We affirm.

The trial court set forth the relevant facts and procedural history of this case as follows:

> On November 20, 2021, [Jeffrey A. George,] Decedent[,] died intestate at the age of 60, survived by his longtime romantic partner, [Appellee].  His death was unexpected, as he was … relatively young and in very good health, as he was an avid runner and cyclist.  Decedent—previously divorced—was unmarried at the time of his death and had no known children or issue.  Although unmarried, Decedent and [Appellee] enjoyed a monogamous common domestic life together, commingling assets and other financial obligations.  [Appellee] is an adult resident of the Commonwealth of Pennsylvania presently residing in a home she shared with Decedent, located [in] Mertztown, Berks County, Pennsylvania (the "Home").  [Appellee] and Decedent acquired the Home together in 2006 as joint tenants with the right of survivorship.  In 2010, they entered into mortgage secured by the Home, issued through RBS Citizens, N.A. ("Citizens")….
>
> Upon Decedent's passing, and with the assistance of a longtime friend of Decedent, William Heydt ("Mr. Heydt"), [Appellee] performed an investigation into Decedent's assets.  At the time of his passing, Decedent owned several investment and retirement accounts custodied/managed by

---

[1] The court set forth its verdict in one order dated July 12, 2024.  The order was entered on the Orphans' Court docket that day but not entered on the Civil Division docket until July 15, 2024.  The instant appeal at No. 1454 MDA 2024 arises from the Orphans' Court docket; the appeal at No. 1472 MDA 2024 arises from the Civil Division docket.  As the issues in both appeals are identical, with the same briefs and trial court opinion filed for each appeal, we dispose of the appeals in one disposition.

various wealth managers. Decedent placed the preponderance of his retirement and investment assets in five accounts custodied by Cetera Investment Services, LLC ("Cetera"), consisting of: (a) an Individual Retirement Account ("IRA") No. XXXX5393; (b) a Roth IRA No. XXXXXX3290; (c) another Roth IRA No. XXX5446; (d) an individual investment Account No. XXXX5434; and (e) a second individual investment Account No. XXX5447 (collectively, the "Cetera Accounts"). Additionally, Decedent possessed: (a) a Roth IRA custodied by Franklin Templeton Investments ("Franklin Templeton") No. XXXX7163 (the "Franklin Templeton Account"); and a UGI Savings Plan managed by Fidelity Investments bearing Account No. XXX0155 ("the Fidelity Account") (together with the Cetera Accounts and the Franklin Templeton Account, the "Retirement Accounts").

On December 23, 2021, Ms. DeLong initiated probate by Letters of Administration and a Short Certificate appointing her administratrix of the Estate. At or around that time, while investigating Decedent's retirement assets and investments, [Appellee] and Mr. Heydt learned that Decedent failed to execute designations naming a beneficiary on the Retirement Accounts.[2] Because Decedent failed to complete/execute the appropriate designations, the Estate, by and through Ms. DeLong, identified the Retirement Accounts as probate assets of the Estate subject to intestate distribution in accordance with the [Pennsylvania Probate, Estates, and Fiduciaries ("PEF")] Code. Under this construct, (a) [Appellee] stands to receive nothing from the disputed Retirement Accounts, and (b) Ms. DeLong stands to receive all Decedent's residuary upon final approval (including all Retirement Accounts less taxes and other estate administration fees/costs).[3]…

---

[2] When determining how to dispose of a decedent account holder's retirement proceeds, Cetera offers written forms providing for Transfer on Death ("ToD") as means of passing assets outside of probate; these designations are equally applicable to both IRA and non-IRA accounts. Franklin Templeton … and Fidelity Investments utilize similar designation forms for purposes of naming a beneficiary and avoiding

probate.

_____

[3] By law of intestacy, Ms. DeLong, as Decedent's sole surviving sibling, is the sole beneficiary.

On February 1, 2022, [Appellee] initiated the Civil Matter, claiming Cetera had wrongfully withheld payment of the Cetera Accounts. Understanding that the Estate also claims entitlement to the proceeds of the Cetera Accounts, Cetera filed a Petition for Interpleader seeking to pay the disputed funds into court and to join the Estate as a party. On September 2, 2022, [Appellee], the Estate, and Cetera entered into Stipulation that, among other things: (a) liquidated the disputed Cetera Accounts into a money market account, without distribution pending further order of court as to proper ownership; (b) removed Cetera as a named party to the Civil Matter; and (c) joined the Estate as an interpleaded claimant.

In the absence of a properly completed designation of beneficiary form, Fidelity delivered funds from the UGI Savings Plan, ($480,549.17) to the Estate by check dated February 24, 2022, subject to a Confirmation as Beneficiary and Release from Later Claims[.] Proceeds from the Franklin Templeton Account (the most recent value totaling $99,114.70 as of an Asset Summary Statement for period January 1, 2001 to September 30, 2021) remain undistributed and subject to a determination as to proper ownership.

On November 3, 2023, [Appellee] filed the immediate Petition in the Orphans Matter (as amended December 11, 2023) pursuant to Section 711 of the PEF [Code] seeking title to the Retirement Accounts by either declaration under the [Declaratory Judgment] Act or the imposition of a constructive trust upon the disputed assets for the benefit of [Appellee], together with a declaration that she is entitled to reimbursement of 50% of the amounts paid on the Mortgage from the date of Decedent's death to the present, and 50% of the ongoing payment obligations to Citizens Bank until such time as the Mortgage is satisfied.

In her Petition, [Appellee] claims title to the disputed

Retirement Accounts pursuant to an oral agreement between [Appellee] and Decedent whereby each agreed to transfer her/his respective policies of insurance, retirement accounts, and other investment assets to the other upon death (the "Agreement"). Under this Agreement, [Appellee] named Decedent as beneficiary on all insurances/retirement accounts, executing the proper designations of beneficiary and ToD forms, with specific reference at times to Decedent being her "domestic partner." [Appellee] was, therefore, surprised to learn upon Decedent's passing that he failed to prepare and execute the necessary forms to effectuate his mutual designations. Even in the absence of such designations, [Appellee] submits Decedent intended to designate her as beneficiary, and that he had taken steps to substantially fulfill that intent. For instance, Decedent indisputably executed multiple designations of beneficiary (and other documents) specifically identifying [Appellee] as beneficiary on certain retirement assets, including: a Global Atlantic Annuity; two life insurance policies issued by MetLife; a HomeServe USA … 401(k) account; and ongoing monthly payments from a defined benefit pension plan from Decedent's employer, EGI Utilities, Inc. ("UGI").[6]

[6] On each of the foregoing accounts, Decedent completed the forms in his own handwriting and named [Appellee] as his primary beneficiary, and on some of these accounts also named Ms. DeLong by name (as opposed to naming his Estate) as contingent beneficiary.

Important to this dispute, Decedent had very recently prior to his death transferred much of his accumulated wealth into new Cetera-managed accounts. Emails from that time between Decedent and his investment representative at Cetera, Gina Katrinak ("Ms. Katrinak"), are consistent with his intent to name [Appellee] as his beneficiary on his Cetera Accounts. In at least one instance, Decedent "parked" a substantial amount of money in a temporary account for a period of approximately one week, designating [Appellee] as his beneficiary on the temporary account, but when those assets were transferred to its final account destination, Decedent's designation did not carryover[.] As further proof of the Agreement, [Appellee] offered a Retirement Analysis

- 5 -

prepared by Fidelity approximately five years prior to Decedent's death for the purpose of addressing their mutual retirement goals, with consideration of, among other things, collective assets and sources of income, including their respective Social Security payments and defined employer benefits. In addition to [the] above [Appellee] offered testimony from several disinterested parties, as well as Ms. DeLong as of cross.

[Appellee offered testimony from Mr. Heydt, a close friend of Decedent who was employed in the financial services industry and is quite familiar with retirement accounts.] Mr. Heydt agreed with counsel for [Appellee] that an individual "should always identify a beneficiary" on qualifying retirement assets to avoid probate (and attendant tax consequences). During their significant time together, Mr. Heydt spoke with Decedent about important life matters, including retirement planning, and Decedent's intentions for the [disposition] of his assets upon his death. Mr. Heydt testified that Decedent knew he needed to designate a beneficiary on his accounts to avoid probate, particularly because he was not married, and that if he failed to do so, his retirement assets might pass to someone he did not intend.

At some point after [Appellee] and Decedent purchased the Home in 2006, but prior to Spring 2021, Decedent informed Mr. Heydt that Decedent and [Appellee] entered into a bilateral agreement to name one another beneficiaries of their respective retirement and investment accounts. Mr. Heydt faithfully recounted Decedent's words (in sum and substance): "[y]eah, … '[t]hats our agreement' … '[s]he's named on all of [my retirement accounts]; and I'm named on all of hers.'" In a separate conversation occurring in the Spring of 2021—approximately 18 months prior to his death, and several weeks after depositing more than $600,000.00 in proceeds from a rollover of his 401(k) to Cetera (Account No. XXXX5393)—Decedent again informed Mr. Heydt that [Appellee] was his "beneficiary on everything." Mr. Heydt remembered the conversation clearly, with attention to the specific circumstances giving rise to the discussion, explaining Decedent was late to meet Mr. Heydt for a bike ride because he had just dropped off

- 6 -

documents with his financial planner (Cetera) earlier that day.

Mr. Heydt asked Decedent about leaving some of his assets to Ms. DeLong (whom Decedent had previously named on "some policy years ago that he had after his divorce"), to which Decedent replied: "[n]o, [Ms. DeLong] and [her husband] are fine. They have plenty of money."

Mr. Heydt testified about similar conversations with Decedent—some as early as 2008, 2009, or 2010—in which he parroted those same representations, indicating that [Appellee] was his beneficiary. When Mr. Heydt asked Decedent why he did not simply marry [Appellee], Decedent explained that he was not in any rush, explaining: "I'm taken care of … [y]ou know, that's why I have her on my [retirement] accounts … [a]nd … she puts me on hers." … Mr. Heydt testified that he has no recollection that Decedent ever discussed intending to write a will.

On cross-examination, Mr. Heydt testified that, when he learned of the missing designations, Mr. Heydt was "shocked," prompting him to contact Ms. Katricak because it "really [did not] connect with what (a) [Decedent] told [Mr. Heydt], and [(b)] what some of these beneficiary forms are from the previous accounts that were being rolled over to the Cetera Accounts." Ms. Katrinak was also surprised by the lack of designations, agreeing with Mr. Heydt that Decedent communicated his desire to "take care of [Appellee]," and that he "wanted to name [Appellee] as beneficiary." … Mr. Heydt also addressed the designation issue directly with Ms. DeLong, telling her she had a "moral quandary" to consider, suggesting all parties knew or should have known Decedent intended to transfer his retirement assets to [Appellee] upon his death. Mr. Heydt confirmed his motivations for testifying at Trial, stating he was not there to offer testimony for [Appellee], or against Ms. DeLong, but rather for his late friend, Decedent. As Mr. Heydt testified, Decedent was a "friend he'd take a bullet for," and he suspected Decedent would have done the same for him. The court expressly determine[d] that Mr. Heydt testified credibly before the court.

[Appellee also offered the testimony of William Buchanan, III, a friend of Decedent who, with his wife, traveled to Rehoboth, Delaware, annually for a running race with Appellee and Decedent. Mr. Buchanan recalled a conversation with Decedent while they were at the race in October 2021, about their respective retirement plans.] Decedent advised Mr. Buchanan that he was in the process of moving his retirement assets to a credit union for management, and he explained to Mr. Buchanan that [Appellee] was the beneficiary of those "accounts at the credit union" (*i.e.*, the Cetera Accounts). On the subject of a will, although Mr. Buchanan discussed the topic with Decedent, like Mr. Heydt, Mr. Buchanan did not express [Decedent's] intention to draft one. Although he admitted to being closer to [Appellee] than Decedent, Mr. Buchanan confirmed that he had no interest in the outcome of the litigation. The court expressly determine[d] that Mr. Buchanan testified credibly before the court.

[Finally, Appellee offered the testimony of Ms. Katrinak, who managed Decedent's Cetera accounts upon transfer from his employer's 401(k).] It is Ms. Katrinak's impression that Decedent was not a particularly "sophisticated investor." She learned that, although unmarried, Decedent was in a domestic partnership with [Appellee]. Ms. Katrinak … explained that it was her understanding they were "basically married" except for a "[marriage] certificate … and an [IRS] tax credit." Decedent informed Ms. Katrinak that he and [Appellee] commingled their household expenses and shared a home and mortgage. Ms. Katrinak assumed that Decedent had a will, but she also acknowledged that she did not know if he had one and he never told her he did[.]

Consistent with Decedent's stated priorities and intentions, Ms. Katrinak formulated a financial plan to provide for [Appellee] and the horses she/they owned together should Decedent predecease [Appellee]. Ms. Katrinak's financial plan for Decedent included rolling over his 401(k) into Cetera IRA Account No. XXXX5393, which was to be accomplished in multiple phases (*i.e.*, by way of two cash tranches in the amount of $604,000.00 and $513,562.52, respectively). Ms. Katrinak explained that Decedent was "sensitive to taxes," agreeing with the statement that

Decedent wanted to pay his fair share of taxes, but not more. Consistent with Mr. Heydt's testimony, Ms. Katrinak agreed that Decedent wanted to avoid probate (and taxation) of his Cetera Accounts. Ms. Katrinak's testimony further supports the finding that Decedent understood he needed to make designations to avoid probate.

[In August 2021, Decedent delivered his second tranche to Cetera via check and executed the required forms to facilitate the deposit, including an application where he identified Appellee as his domestic partner and designated her as his 100% beneficiary.] On August 12, 2021 (after delivering his second check), Decedent exchanged emails with Ms. Katrinak at her Cetera email account address in which Decedent asked Ms. Katrinak if she needed anything further from him to accomplish their plans for the additional rollover, to which she responded "[n]othing else needed!" From that point onward, there was no further discussions regarding the documents submitted on August 6, 2021, nor were there any communications regarding the beneficiary designation for Account No. XXXX5393.

Concerning the beneficiary designation process, generally, Ms. Katrinak stated that Cetera's initial application for an IRA account type specifically includes a section for identifying a beneficiary. In the instance of an individual or other investment account, however, an account holder must designate a beneficiary by separate form. She also indicated that any change in designation following an initial account application must be accomplished by submitting a prescribed beneficiary designation form….

Validating Mr. Heydt's earlier testimony, Ms. Katrinak expressed that, upon learning of Decedent's death, she was surprised to learn that [Appellee] was not the identified beneficiary on Decedent's Cetera Accounts. Instead, the initial Cetera application for Account No. XXXX5393 purported to name "Jeffrey George Estate" as 100% beneficiary. Ms. Katrinak did not know how it came to be that "Jeffrey George Estate" was identified as beneficiary on that account, or on Account No. XXXXX5446 (a Roth IRA). Ms. Katrinak conceded, however, that, had Decedent inadvertently left the designation blank in his initial

application, it would have resulted in the Estate being named beneficiary by default. Ms. Katrinak does not possess any contemporaneous notes in her file suggesting that Decedent ever intended to name the Estate as beneficiary; in fact … this was entirely inconsistent with Ms. Katrinak's understanding of Decedent's intention to name [Appellee] on all his Cetera Accounts. … As further evidence of her understanding that Decedent intended to name a beneficiary other than the Estate, Ms. Katrinak identified and authenticated email communications with Decedent from November and December 2020 in which Decedent expressed his desire to change the beneficiary on Account No. XXXX5393 (then the Estate) after his initial cash deposit.[12] Although Decedent did not specifically nominate a beneficiary in the relatively brief email thread, based upon prior discussions with Decedent, and consistent with her financial plan for Decedent, Ms. Katrinak "absolutely" anticipated and assumed that Decedent intended to identify [Appellee] as beneficiary. … Ms. Katrinak admitted that administrative mistakes can happen when processing forms such as beneficiary designations. [She explained that one such mistake occurred in processing a change of beneficiary for Decedent's Global Atlantic Annuity, and after investigation it was determined that Global Atlantic had not processed the beneficiary designation form. Global Atlantic thereafter delivered the funds to Appellee.]

> [12] Had he wanted the Estate to be named beneficiary, he need not do anything.

Ms. Katrinak further illuminated on Decedent's subsequent cash infusion in August 2021. Upon receiving the check, Ms. Katrinak transferred the funds into Decedent's new account, but Decedent's designation … identifying [Appellee] as his "domestic partner" and 100% beneficiary—was not provided to Cetera notwithstanding that Ms. Katrinak, as "[Decedent's] Cetera agent," gave him the form to initiate the funding. In any event, Ms. Katrinak stated that, had the information Decedent populated on the application been on Cetera's prescribed form, she would have had a duty to supply it to Cetera and it would have been sufficient to prompt Cetera to make sure its records identified [Appellee] as Decedent's beneficiary for the totality of Account No.

XXXX5393.  On this point. Ms. Katrinak specifically conceded that "Cetera's agent had this information on [Decedent's most recent beneficiary designation identifying Appellee] … [b]ut Cetera's home office, because it's not the right form, didn't get this information."  The court expressly determine[d] that Ms. Katrinak testified credibly before the court.

Ms. DeLong was Decedent's only sibling, and she is his sole surviving blood relative.  After their parents died, Decedent and Ms. DeLong "really only had each other as far as siblings are concerned."  Although Ms. DeLong has known [Appellee] since she began dating Decedent, Ms. DeLong had difficulty recalling when the relationship started, surmising it was a year or more after they jointly purchased a home together.  Ms. DeLong admitted that Decedent and [Appellee] built the Home, and that they were co-mortgagors on the purchase money/construction loan.  Despite this admission, Ms. DeLong would not agree that Decedent and [Appellee] "worked and saved together," or that they shared financial obligations.  Further, Ms. DeLong pushed back at the suggestion [Appellee] was Decedent's "domestic partner," claiming she instead was his "girlfriend,"[14] prompting a line of questioning on this point by counsel for [Appellee]. …

[14] The court presume[d] that Ms. DeLong ma[de] this semantical distinction believing the term "domestic partner" connotes greater legal significance in these proceedings.

… In full review of Ms. DeLong's testimony, she knew little about Decedent's financial affairs during his life. …  All the foregoing suggests Decedent never discussed these things with his sister, which is consistent with other testimony in the case that Decedent was a private man. …

[Appellee] offered relatively little [testimony], opting instead to establish her needed proofs through more competent evidentiary means.  She did explain, however, that she believed Decedent had named her [as] beneficiary on all his retirement assets.  She acknowledged receiving some of those assets, including Decedent's life insurance policies, a portion of his pension from UGI, and the proceeds

        from the Global Atlantic Annuity. …

(Trial Court Opinion, filed 7/15/24, at 3-22) (formatting provided, some capitalization omitted).

        Based upon the foregoing testimony and evidence, the court found that Decedent's designation naming the Estate as beneficiary of Account No. XXX5393 "happened by default resulting from an omission on the initial application(s)." (*Id.* at 23). Furthermore, the court found that Decedent submitted "a completed designation of beneficiary in or around December 2020 (or shortly thereafter) designating [Appellee] as beneficiary on the Cetera Accounts, including Account No. XXXX5393." (*Id.* at 24). "Decedent's subsequent designation when making his second substantial rollover contribution in [August] 2021 more than supports the notion that he intended to identify [Appellee] on Account No. XXXX5395." (*Id.* at 25). There, he identified Appellee as his domestic partner and 100% beneficiary. The court explained that although the designation was on the form required by Cetera, Decedent made the designation on a document than an agent of Cetera provided to him and "[i]t would, therefore, be reasonable for any individual to believe that it served to make a designation or confirm an existing one." (*Id.*) (emphasis omitted).

        Ultimately, the court concluded that "[Appellee] entered into the valid and enforceable bilateral Agreement with Decedent, supported by substantial consideration in the form of mutual obligations, requiring that the parties

execute all documentation required to identify one another beneficiaries on their respective retirement accounts." (*Id.* at 27). "[Appellee] substantially performed under the Agreement, naming Decedent beneficiary on all her retirement accounts, policies, and other assets." (*Id.*) "Decedent failed to explicitly identify [Appellee] as his beneficiary on … each of the Retirement Accounts on the form required by the respective custodian, constituting a material breach of the Agreement." (*Id.* at 28) (footnote omitted). "As a direct result of Decedent's breach, [Appellee] suffered money damages in amounts equal to the proceeds of each of the foregoing Retirement Accounts." (*Id.*)

On July 12, 2024, the trial court entered its verdict in favor of Appellee and against Appellants.[2] Appellants filed a post-trial motion for reconsideration on July 19, 2024. The court granted reconsideration and held a hearing on September 18, 2024, after which it denied Appellants' motion. Appellants filed timely notices of appeals at both the Civil and Orphans' court dockets on October 4, 2024.[3] Pursuant to the court's order, Appellants filed a concise statement of errors complained of on appeal on October 24, 2024.

_____

[2] Although Ms. DeLong is the sole beneficiary of the Estate, we refer to Ms. DeLong and the Estate as separate appellants, consistent with the trial court's references to Ms. DeLong and the Estate and the captions of these appeals.

[3] This Court did not direct Appellants to *praecipe* for the entry of judgment because the "judgment for purposes of appeal is the initial order declaring
*(Footnote Continued Next Page)*

- 13 -

Appellants raise the following issues on appeal:

1. Did the trial court err in failing to find that 20 Pa.C.S.[A.] § 2701 applied, and to properly apply said statute, to the alleged agreement between Appellee and [Decedent]?

2. Did the trial court err in finding the existence of an oral contract between [Appellee] and [Decedent] and in failing to apply the proper, heightened, standard for reviewing breaches of oral contracts against a Decedent's estate?

3. Did the trial court err in finding that consideration existed between [Appellee] and [Decedent] for the alleged agreement?

4. Did the trial court err in finding that [Decedent's] actions related to designating Appellee as beneficiary of Cetera Account No. XXXX5393 satisfied the doctrine of substantial compliance?

5. Did the trial court err in finding that (a) [Decedent] had submitted a completed designation of beneficiary in or around December 2020 designating Appellee as beneficiary on the Cetera Accounts, including Account No. XXXX5393 and (b) that said form was misplaced and/or not processed by Cetera?

6. Did the trial court err in permitting [Appellee's] counsel to lead her witness, William Heydt, in testifying to the existence of the alleged agreement between [Appellee] and [Decedent]?

(Appellants' Brief at 5-6) (questions reorganized for purposes of disposition)

_____

rights as to which post-trial motions are filed, such that the appeal of judgment is triggered by the order denying post-trial motions, not a subsequent entry of judgment on *praecipe*." ***Affordable Outdoor, LLC v. Tri-Outdoor, Inc.***, 210 A.3d 270, 279 n.12 (Pa.Super. 2019). As such, this Court allowed the appeal to proceed as timely. ***See id. See also*** 42 Pa.C.S.A. § 7532 (providing that order in declaratory judgment action that either affirmatively or negatively declares rights, status, and other legal relations is final).

(unnecessary capitalization omitted).

In their first issue, Appellants argue that the court failed to apply Section 2701 of the PEF Code in reaching its decision. Appellants assert that Section 2701 is applicable because the purported agreement between Appellee and Decedent was akin to a contract to make a will. Appellants contend that because the agreement concerned Appellee and Decedent designating each other as post-death beneficiaries, the agreement's purpose was an obligation dischargeable at death. Appellants claim that Section 2701 requires such agreements to be in writing. Appellants insist that because the agreement between Decedent and Appellee was not included in a will or a writing signed by Decedent, the agreement violates Section 2701 and is not enforceable. Alternatively, Appellants submit that the agreement is a contract to make a testamentary agreement, and Section 2701 would still apply in that case and require a writing to be enforceable. Appellants conclude they are entitled to relief on these grounds. We disagree.

Appellants' first question, concerning the applicability of Section 2701 of the PEF Code, "presents a pure issue of law, and, thus, our standard of review is *de novo* and our scope of review is plenary." ***Freedom Medical Supply, Inc. v. State Farm Fire & Casualty Company***, 635 Pa. 86, 131 A.3d 977, 980 (2016).

> The object of interpretation and construction of all statutes is to ascertain and effectuate the intention of the General Assembly. When the words of a statute are clear and free

from all ambiguity, their plain language is generally the best indication of legislative intent. A reviewing court should resort to other considerations to determine legislative intent only when the words of the statute are not explicit. In ascertaining legislative intent, this Court is guided by, among other things, the primary purpose of the statute, and the consequences of a particular interpretation.

Moreover, it is axiomatic that in determining legislative intent, all sections of a statute must be read together and in conjunction with each other, and construed with reference to the entire statute.

*Prieto Corp. v. Gambone Const. Co.*, 100 A.3d 602, 606-07 (Pa.Super. 2014) (citation omitted).

Chapter 27 of the PEF Code concerns contractual arrangements relating to succession. Section 2701, on which Appellants rely, provides as follows:

**§ 2701. Contracts concerning succession**

**(a) Establishment of contract.**—A contract to die intestate or to make or not to revoke a will or testamentary provision or an obligation dischargeable only at or after death can be established in support of a claim against the estate of a decedent only by:

(1) provisions of a will of the decedent stating material provisions of the contract;

(2) an express reference in a will of the decedent to a contract and extrinsic evidence proving the terms of the contract; or

(3) a writing signed by the decedent evidencing the contract.

**(b) Joint will or mutual wills.**—The execution of a joint will or mutual wills does not create a presumption of a contract not to revoke the will or wills.

20 Pa.C.S.A. § 2701.

This Court has only applied and interpreted Section 2701 in unpublished decisions, all of which involve provisions within wills or contracts to revoke or not to make wills. ***See, e.g., Hay v. Michel***, 332 A.3d 1245 (Pa.Super. filed Dec. 19, 2024) (unpublished memorandum)[4] (applying Section 2701 in considering whether appellants had set forth sufficient facts to establish breach of contract not to revoke will and holding that appellants failed to plead facts to establish contract not to revoke will under either prong two or three of Section 2701). Appellants have not cited, nor has our research revealed, any authority where Section 2701 was applied to an oral agreement to name beneficiaries for retirement or investment accounts.

Unlike Appellants, Appellee and the trial court contend that Chapter 64 of the PEF Code, entitled the Transfer on Death Security Registration Act, applies in this case. Chapter 64 provides "a mechanism by which account owners can provide for the non-probate transfer of their assets upon their death." ***In re Est. of Wierzbicki***, 174 A.3d 1061, 1065 (Pa.Super. 2017). Section 6409 of the PEF Code, concerning nontestamentary transfer of property, provides as follows:

**§ 6409. Nontestamentary transfer on death**

**(a) General rule.**—A transfer on death resulting from a registration in beneficiary form is effective by reason of the

---

[4] ***See*** Pa.R.A.P. 126(b) (stating we may rely on unpublished decisions of this Court filed after May 1, 2019 for persuasive value).

> contract regarding the registration between the owner and the registering entity and this chapter and is not testamentary.

20 Pa.C.S.A. § 6409.

> Under 20 Pa.C.S.A. § 6409, "Nontestamentary transfer on death," a financial institution may effect a nontestamentary transfer of an account upon death of the owner only if the owner had signed a "registration in beneficiary" form, which forms a contract between the owner and the financial institution to do so. Otherwise, the account is property of the estate. **See, generally, In re Estate of Wierzbicki**[**, supra**].

**In re Est. of Walter**, 191 A.3d 873, 882 (Pa.Super. 2018).

Instantly, in its Rule 1925(a) opinion, the trial court referenced a non-published federal court decision from the Middle District of Pennsylvania for the proposition that oral contracts pertaining to beneficiary designations are enforceable and do not have to comply with Section 2701's requirements.[5] In **AAA Life Ins. Co. v. Kneavel**, the federal district court applied Pennsylvania law to its determination of whether an oral agreement for a decedent to name his sister as a beneficiary to a life insurance policy in exchange for her caring for him and paying the premiums on the policy was enforceable. **See AAA Life Ins. Co. v. Kneavel**, No. 1:10-CV-00158 (M.D.Pa. filed Sept. 17, 2012). There, the court found that clear and convincing evidence demonstrated that

---

[5] This Court "is not bound by the decisions of federal courts, other than the United States Supreme Court[;] however, we may use them for guidance to the degree we find them useful and not incompatible with Pennsylvania law." **Eckman v. Erie Ins. Exch.**, 21 A.3d 1203, 1207 (Pa.Super. 2011) (internal citation omitted).

a valid oral contract existed and the sister was entitled to the proceeds of the insurance policy. *See id. See also In re Estate of Golas*, 751 A.2d 229, 231 n.3 (Pa.Super. 2000) (concluding that principles relevant to cases involving beneficiaries to insurance policies are likewise relevant to cases involving beneficiaries to retirement plans).

The trial court went on to explain that "Decedent and [Appellee's] mutual designations were non-testamentary in nature and, in fact, were designed to **avoid** probate." (Trial Court Opinion, dated 11/26/24, at 7) (emphasis in original). The court further stated:

> [B]oth Decedent and [Appellee] could only perform under the Agreement during their lives by making the required mutual designations, and a failure to do so by either of them constituted a material breach. As such, these obligations are not **only** dischargeable at death (or at all, as a testamentary instrument generally cannot change a beneficiary designation).

(*Id.*) (emphasis in original).

The record supports the trial court's findings that the obligation in Appellee and Decedent's oral agreement, to designate one another as beneficiary of their respective accounts, was not an obligation dischargeable only at or after death. *Compare* 20 Pa.C.S.A. § 2701. To the contrary, the obligation to name one another as beneficiary was intended to be effectuated during Appellee and Decedent's life. We further agree with the trial court that Appellee and Decedent's agreement was not a contract to die intestate or to make or not revoke a testamentary provision. *Compare id.* Thus, we

disagree with Appellants' assertion that Section 2701 is applicable here and renders the agreement between Appellee and Decedent unenforceable simply because it was not reduced to a writing.[6] Rather, we agree with the trial court that Section 6409 of the PEF Code, concerning nontestamentary transfer of property, applies to the agreement between Appellee and Decedent. *See* 20 Pa.C.S.A. § 6409. Appellants' first issue merits no relief.

In their second issue, Appellants argue that because this case involves claims against a decedent's estate based on an oral contract, the court should have employed a heightened standard of proof. Appellants insist that the existence and terms of an oral contract must be established by clear, precise and indubitable evidence. Although we agree with Appellants' assertions, Appellants are still not entitled to relief on this claim.

Pennsylvania courts have held that claims based on an oral contract against a decedent's estate must meet a high evidentiary standard, and the evidence in support of finding an enforceable agreement must be "clear, precise and indubitable." *Stafford v. Reed*, 363 Pa. 405, 410, 70 A.2d 345, 348 (1950) (explaining that "claims of this nature must be subjected to the closest scrutiny, being objects of just suspicion … and must be established by evidence 'clear, precise, and indubitable'") (citation omitted). In order for

---

[6] Nevertheless, such an agreement is still required to meet the legal requirements for an enforceable contract under Pennsylvania law, as we address in our discussion of Appellants' next claim.

evidence to be clear, precise and indubitable, "the witnesses must be credible, … distinctly remember the facts to which they testify, and narrate the details exactly." *Id.* at 410-411, 70 A.2d at 348 (citations and internal quotation marks omitted). Furthermore, the witnesses' testimony must be so "clear, direct, weighty, and convincing" as to enable the factfinder to find "without hesitancy, … the truth of the precise facts in issue." *Id.* at 411, 70 A.2d at 348 (citations omitted).

Instantly, the trial court explained that it made its findings of fact under the required standard, and each finding satisfied both the preponderance of evidence **and** an enhanced clear and convincing standard of proof. (**See** Trial Court Opinion, 11/26/24, at 10 n.11). We agree with Appellants that because the claim concerns an oral contract against the Decedent's estate, the heightened standard of review applies. However, because the trial court applied the heightened standard, Appellants' second issue merits no relief.

In their third issue, Appellants challenge the trial court's finding that the agreement between Appellee and the Decedent was a valid and enforceable oral agreement. Specifically, Appellants argue that there was no consideration to render the agreement valid and enforceable. Appellants claim that there was nothing to suggest that either Decedent or Appellee agreed not to ever change their beneficiaries, and as such, the alleged exchanged consideration is illusory. Appellants cite **In re Estate of Imbruglia**, 479 Pa. 95, 387 A.2d 851 (1978), and claim that because there is nothing in the record to suggest

that Appellee and Decedent agreed to refrain from changing their beneficiaries, the exchange of beneficiaries itself was inadequate consideration. Appellants conclude the agreement between Appellee and Decedent was unenforceable on these grounds, and this Court must grant relief. We disagree.

Our standard of review of an order denying post-trial relief following a non-jury trial is well settled.

> When reviewing the denial of post-trial relief following a non-jury trial, we are to determine only "whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law." *Stephan v. Waldron Elec. Heating & Cooling LLC*, 100 A.3d 660, 664 (Pa.Super. 2014) (quoting *Wyatt, Inc. v. Citizens Bank of Pennsylvania*, 976 A.2d 557, 564 (Pa.Super. 2009)). "The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner." *Id.* Moreover, we are mindful that "the trial judge, as finder of fact, is free to believe all, part, or none of the evidence, and this Court will not disturb his credibility determinations." *Williams v. Taylor*, 188 A.3d 447, 450 (Pa.Super. 2018). Accordingly, "[w]e will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law. However, where the issue concerns a question of law, our scope of review is plenary." *Stephan*, 100 A.3d at 664-65 (some punctuation omitted).

*Gasbarre Prods., Inc. v. Smith*, 270 A.3d 1209, 1217-18 (Pa.Super. 2022).

Furthermore, we reiterate that the evidence in support of finding an enforceable agreement in this case must be "clear, precise and indubitable."

*Stafford, supra* at 410, 70 A.2d at 348.

- 22 -

Our interpretation of whether an oral agreement existed, and the terms of any such oral agreement, "implicates questions of fact, for which our standard of review is deferential to the factfinder." ***Glover v. Junior***, ___ Pa. ___, ___, 333 A.3d 323, 339 (2025). As our Supreme Court has explained, where the terms of an oral contract are in dispute, it raises a question for the fact-finder. ***Id.*** "In contract cases, then, the fact-finder must evaluate whether the evidence establishes facts that could meet the requisite elements of a contract[:] an offer, acceptance, and consideration." ***Id.*** "[O]nce those facts are found, it becomes a question of law whether they satisfy the requisite legal elements." ***Id.*** at ___, 333 A.3d at 339 n 12.

"Consideration is defined as a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." ***Id.*** at ___, 333 A.3d at 339 (citation omitted). "The detriment incurred must be the '*quid pro quo*', or the 'price' of the promise, and the inducement for which it was made. Consideration must actually be bargained for as the exchange for the promise." ***Id.*** at ___, 333 A.3d at 339–40 (citations and some internal quotation marks omitted).

Instantly, the trial court explained:

> [L]ooking to the totality of the record, the surrounding circumstances and course of dealings between Decedent and [Appellee] reveals an intent to contract. Convincing evidence includes the testimony of numerous disinterested witnesses, each of whom testified credibly not only as to Decedent's stated desire to avoid probate and pay over his retirement assets and insurances to [Appellee], but also his

- 23 -

express acknowledgement of the Agreement and its obligations.

(Trial Court Opinion, 11/26/24, at 10) (footnote omitted). The trial court further explained:

Regardless of the evidentiary standard applied (preponderance or an enhanced standard), [Appellee] established to the Trial Court's satisfaction each of the following, among others:

▪ [Appellee] and Decedent viewed one another as domestic partners with joint financial resources and obligations, including a primary mortgage.

▪ They orally agreed that each would … name the other primary and sole beneficiary of their respective retirement assets and insurances.

▪ [Appellee] identified Decedent as her primary beneficiary on all her insurances and retirement accounts by executing the proper designations of beneficiary and Transfer on Death ("ToD") forms, with specific reference at times to Decedent as her "domestic partner."

▪ In 2020 and 2021, Decedent transferred more than $1,000,000.00 in existing retirement assets to Cetera—the overwhelming majority of which ended up in Cetera IRA Account No. x5393.

▪ Funding was accomplished by way of separate cash tranches in the amounts of $604,000.00 and $513,562.52, respectively.

▪ When transferring these assets, Decedent purportedly failed to prepare and execute the necessary ToD/beneficiary designation forms to effectuate his mutual obligations under the Agreement.

- 24 -

As further proof of the Agreement, [Appellee] offered a Retirement Analysis prepared by Fidelity for Decedent and [Appellee] approximately five years before Decedent died for the purpose of addressing their mutual retirement goals, with consideration of, among other things, collective retirement assets and sources of income, including Social Security payments and defined employer benefits.

The foregoing evidence is more than sufficient to establish the existence of an oral contract. The contractual terms, simple as they are, are well defined: [Appellee] would designate Decedent as her beneficiary on all non-probate retirement assets, and Decedent would do the same. These mutual promises plainly constitute adequate consideration. Further, the parties could only fulfill their obligations by executing the appropriate documents required by their respective financial custodians during their lives.

(*Id.* at 10-11) (citations and footnote omitted).

The record supports the trial court's determinations. Applying the heightened standard of proof applicable to enforcement of an oral contract against an estate, we conclude that the witnesses' testimony clearly, precisely, and indubitably established that "[Appellee] entered into the valid and enforceable bilateral agreement with Decedent, supported by substantial consideration in the form of mutual obligations, requiring that the parties execute all documentation required to identify one another beneficiaries on their respective retirement accounts." (Trial Court Opinion, 5/24/23, at 27). *See also Stafford, supra*.

Although Appellants rely on *In re Estate of Imbruglia, supra*, that case is distinguishable. There, our Supreme Court held that a decedent's initial will, which contained a preamble stating that the will was made in

consideration of a will made by his first wife, was not enough to establish a legal obligation to forbear revocation. *Id.* at 98, 387 A.2d at 853.

Here, the instant agreement concerned actions that Decedent and Appellee would undertake during their lives and does not involve any promises either to make or not to revoke a will. As part of the agreement, Appellee and Decedent bargained for and agreed upon consideration, that in exchange for Appellee naming Decedent as her primary beneficiary on her accounts, Decedent would likewise name Appellee as his primary beneficiary. *See Glover, supra.* It is also clear that the mutual promises of naming one another as beneficiaries was bargained for as the exchange for the promise. *See id.* Accordingly, we conclude that the trial court did not err when it found that Appellee and Decedent entered into a valid oral agreement to name one another as beneficiary on their respective investment and retirement accounts. We further agree with the trial court that the clear, precise and indubitable evidence admitted at trial proves that the agreement fulfilled the offer, acceptance, and consideration requirements required of a valid contract. *See id.*; *Stafford, supra.* Therefore, Appellants' challenge to the validity of the agreement is meritless.[7]

---

[7] Appellants challenge only the validity of the agreement, and do not challenge the trial court's findings that Decedent breached the agreement, or that Appellee suffered money damages in amounts equal to the proceeds of each of the Retirement Accounts (Cetera Account No. XXXX5393; Cetera Account
*(Footnote Continued Next Page)*

Appellants' fourth and fifth issues concern the trial court's finding that the doctrine of substantial compliance supports a finding in equity that Decedent intended to name Appellee as his beneficiary.[8]  As discussed **supra**, the trial court properly determined that Appellee and Decedent entered into a valid agreement to name one another as beneficiary to their respective accounts.  Because Decedent did not complete his obligation pursuant to that agreement, the trial court concluded that Decedent breached the agreement, and as a result of the breach, Appellee suffered money damages and is "entitled to ownership over the proceeds of Decedent's retirement and investment accounts, together with any earnings thereon."  (Trial Court Opinion, 7/15/24, at 28).  The trial court further found that the doctrine of substantial compliance would also act to effectuate Decedent's intent to name Appellee as his beneficiary and provide an alternate basis under which Appellee is entitled to relief.  Nevertheless, because we have affirmed the trial

_____

No. XXXX5434; Cetera Account No. XXXX5446; Cetera Account No. XXXX5447; Cetera Account No. XXXX3290; Fidelity Account No. XXX0155; Franklin Templeton Account No. XXXX7163).  (Trial Court Opinion, 7/15/24, at 28).

[8] The doctrine of substantial compliance is an equitable principle which allows courts to overlook minor or procedural defects in contract performance to avoid forfeiture and protect those who have endeavored to perform their contracts.  **Atl. LB, Inc. v. Vrbicek**, 905 A.2d 552, 558 (Pa.Super. 2006) (stating: "The doctrine is intended for the protection and relief of those who have faithfully and honestly endeavored to perform their contracts in all material and substantial particulars") (citation and internal quotation marks omitted).

court's primary conclusion, we need not address the trial court's alternate reasoning relating to the doctrine of substantial compliance, and do not reach Appellants' fourth and fifth issues.

Finally, we turn to Appellants' challenge to the trial court's evidentiary ruling. Appellants claim that the trial court abused its discretion when it permitted Appellee's attorney to ask Mr. Heydt whether Decedent used the word "agreement" in his conversation with Mr. Heydt. Appellants insist that such a question was leading and that Mr. Heydt's original testimony did not include any reference to an oral contractual agreement between Decedent and Appellee. Appellants further argue that because the issue of whether there was an agreement was central to Appellee's case, the court's error was not harmless. We disagree.

Our standard of review of a trial court's evidentiary ruling is as follows:

> When we review a trial court ruling on admission of evidence, we must acknowledge that decisions on admissibility are within the sound discretion of the trial court and will not be overturned absent an abuse of discretion or misapplication of the law. In addition, for a ruling on evidence to constitute reversible error, it must have been harmful or prejudicial to the complaining party. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence or the record, discretion is abused.

*Gregury v. Greguras*, 196 A.3d 619, 633 (Pa.Super. 2018), *appeal denied*, 651 Pa. 504, 205 A.3d 1230 (2019). "The allowance of leading questions lies

within the discretion of the trial court and a court's tolerance or intolerance of leading questions will not be reversed absent an abuse of discretion." *Katz v. St. Mary Hosp.*, 816 A.2d 1125, 1128 (Pa.Super. 2003) (citation omitted).

Furthermore, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or [unduly] prejudicial to the complaining party." *Ettinger v. Triangle-Pacific Corp.*, 799 A.2d 95, 110 (Pa.Super. 2002), *appeal denied*, 572 Pa. 742, 815 A.2d 1042 (2003). Harmless error is defined as an error that does not affect the verdict. *Yacoub v. Lehigh Valley Medical Associates, P.C.*, 805 A.2d 579, 590 (Pa.Super. 2002), *appeal denied*, 573 Pa. 692, 825 A.2d 639 (2003).

Here, the following exchange occurred at trial:

> [APPELLANTS' COUNSEL]: Now, can you finish up the point? [Decedent] acknowledged that [Appellee] was—I believe you said a beneficiary on all of his stuff and he was beneficiary on all of her stuff. What else did he tell you as to why?
>
> [MR. HEYDT]: He just said, "You know, we're not married. But, you know, we basically treat each other like we are. And, you know, she's named me on everything of hers. And I named her on all of my things."
>
> [APPELLANTS' COUNSEL]: Okay. Did [Decedent] use the word agreement between them?
>
> [APPELLEE'S COUNSEL]: Objection, leading.
>
> THE COURT: Overruled. Go ahead.
>
> [MR. HEYDT]: Yeah. He said, "That's our agreement." He said, "She's named on all of mine; and I'm named on all of hers."

- 29 -

(N.T. Trial, 4/10/24, at 35-36).

In evaluating Appellants' evidentiary challenge, the trial court explained:

> Here, the purportedly objectionable question is not strictly leading—or, more specifically, one suggesting a desired answer (*e.g.*, "[i]sn't it true that Decedent admitted that he had an enforceable oral agreement with [Appellee]?")[.] Even assuming the question could be construed as leading, at worst, it suggests a word and nothing more. The existence of a contract, of course, is a legal conclusion for the [t]rial [c]ourt. Whether Decedent used the word "agreement" in his conversation with Mr. Heydt has little significance beyond Decedent's understanding of what, if anything, he and [Appellee] may have promised one another. It does not inform the [t]rial [c]ourt's determination as to the existence of a contract. Instead, that conclusion is made upon consideration of the substantial factual record.
>
> To be sure, the question and answer is offered in the context of a larger discussion where Mr. Heydt, without objection, described in his own words a conversation with Decedent in which Decedent expressed a mutual arrangement with [Appellee] to name her beneficiary and vice versa. That arrangement is corroborated by the testimony of multiple other witnesses. The elicited response is not so prejudicial as to warrant a sustained ruling or striking the question and answer from the record (which counsel for [Appellants] did not request in any event). Most importantly, the [t]rial [c]ourt is granted wide discretion in controlling the use of such questions, and the absence of a jury in this matter further negates any prejudicial effect from an improper question. Respectfully, this issue has no merit.

(Trial Court Opinion, 11/26/24, at 21).

The record supports the trial court's analysis. As the trial court notes,

Appellee's attorney did not suggest a specific desired answer to the question

posed. Thus, we agree with the trial court that the question was not leading. Moreover, the trial court had the discretion to permit leading questions, and we see no abuse of discretion here. ***See Katz, supra***. Further, any error in this context would be harmless. As the trial court explained, whether Decedent used the word agreement in his conversation with Mr. Heydt "[did] not inform the [t]rial [c]ourt's determination as to the existence of a contract. Instead, that conclusion [was] made upon consideration of the substantial factual record." (Trial Court Opinion, 11/26/24, at 21). Thus, any error in the court's evidentiary ruling did not control the outcome of the case. ***See Yacoub, supra***. Appellants' final issue does not merit relief. Accordingly, we affirm.

Orders affirmed.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: 09/08/2025

- 31 -